**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK,

                    Plaintiff,

      v.

ENCYCLOPAEDIA IRANICA FOUNDATION,

                  Defendant.

No. 19 Civ. 7465 (AT)(KNF)

ENCYCLOPAEDIA IRANICA FOUNDATION,
INC.,

                    Plaintiff,

      v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, ELTON DANIEL
AND BRILL USA, INC.,

                  Defendants.

No. 19 Civ. 8562 (AT)(KNF)

**POST-HEARING MEMORANDUM OF LAW OF COLUMBIA UNIVERSITY**
**AND ELTON DANIEL IN OPPOSITION TO**
**EIF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 5

    A.   Columbia University's Center for Iranian Studies ................................................ 5

    B.   Columbia's First Use of the Encyclopaedia Iranica Mark ................................... 6

    C.   Columbia's Editorial Control Over the Encyclopaedia.................................... 7

    D.   Professor Yarshater Forms EIF as an Additional Fundraising Source for the
       *Encyclopaedia* ............................................................................................. 9

    E.   Dr. Daniel Is Appointed By Columbia As The Interim Director of the Center ............ 11

    F.   EIF Attempts to Rewrite the History of the *Encyclopaedia*........................................... 12

    G.   EIF Interferes With Columbia's Efforts to Publish the Work........................................ 14

    H.   EIF's 2019 Registration of the Mark and Columbia's Challenge ................................. 14

ARGUMENT .................................................................................................................. 15

  I.    EIF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED ........ 15

    A.   EIF Cannot Demonstrate Irreparable Harm ................................................... 16

        1.   EIF's Delay in Seeking Injunctive Relief Requires Denial of Its Motion.............. 16

        2.   Columbia's Publication of the Fascicle Does Not Constitute Irreparable Harm ... 17

    B.   EIF Cannot Establish A Likelihood of Success on the Merits or Even Sufficiently
       Serious Questions Going to the Merits ............................................................ 20

        1.   Columbia Has Priority of Use of the Mark ......................................... 20

        2.   Columbia Has Always Controlled the Quality of the Encyclopaedia ................. 24

        3.   There Is No Evidence That Ownersip of the Trademark Was Transferred to EIF.26

    C.   EIF Cannot Establish That The Balance of Hardships Tips Decidedly In Its Favor ..... 28

    D.   A Preliminary Injunction is Not in the Public's Interest................................................. 29

    CONCLUSION.................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ballet Tech Foundation v. The Joyce Theater Foundation, Inc.*,
  89 U.S.P.Q.2d 1262 (T.T.A.B. 2008), *vacated as moot*, 2013 WL 6199539 .........................26

*Bell v. Streetwise Records, Ltd.*,
  640 F. Supp. 575 (D. Mass. 1986) ...................................................................................24

*C=Holdings B.V. v. Asiarim Corp.*,
  992 F. Supp. 2d 223 (S.D.N.Y. 2013)...............................................................................27

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985)........................................................................................16, 17

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010)................................................................................................20

*Citizens United v. Schneiderman*,
  115 F. Supp. 3d 457 (S.D.N.Y. 2015)...............................................................................18

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
  897 F.3d 413 (2d Cir. 2018)........................................................................................23, 24

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
  13 F. Supp. 2d 417 (S.D.N.Y. 1998).................................................................................16

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)................................................................................................18

*Greylock Glob. Opportunity Master Fund Ltd. v. Province of Mendoza*,
  No. 04 Civ. 7643 (HB), 2004 WL 2290900 (S.D.N.Y. Oct. 12, 2004) ................................28

*Hello I Am Elliot, Inc. v. Sine*,
  No. 19 Civ. 6905 (PAE), 2020 WL 3619505 (S.D.N.Y. July 2, 2020) ......................15, 17, 18

*ITC Ltd. v. Punchgini, Inc.*,
  482 F.3d 135 (2d Cir. 2007)..............................................................................................20

*Liebowitz v. Elsevier Science Ltd.*,
  927 F. Supp. 688 (S.D.N.Y. 1996) ...............................................................................24, 25

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)..........................................................................................................15

*N. Am. Soccer League v. United States Soccer Fed'n Inc.*,
    883 F.3d 32 (2d Cir. 2018).................................................................................28

*Nordco A.S. v. Ledes*,
    No. 95 CIV. 7753 (RJW), 1997 WL 570546 (S.D.N.Y. Sept. 15, 1997) ................................27

*Oneida Nation of N.Y. v. Cuomo*,
    645 F.3d 154 (2d Cir. 2011)...............................................................................15

*Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Academy
    Alumni Association, Inc.*,
    2014 WL 857947 (D. Md. Mar. 4, 2014)................................................................18

*Sengoku Works v. RMC Int'l*,
    96 F.3d 1217 (9th Cir. 1996) .........................................................................20, 24

*Tough Traveler, Ltd. v. Outbound Prod.*,
    60 F.3d 964 (2d Cir. 1995)...........................................................................16, 17

*Tr. Co. Bank v. Putman Pub. Grp., Inc.*,
    No. 87 Civ. 7393 (AHS), 1988 WL 62755 (C.D. Cal. Jan. 4, 1988).....................................29

*Vanderbilt Univ. v. Scholastic, Inc.*,
    382 F. Supp. 3d 734 (M.D. Tenn. 2019).............................................................22, 27

*Vanderhurst v. Colorado Mountain Coll. Dist.*,
    16 F. Supp. 2d 1297 (D. Colo. 1998)....................................................................27

*Villanova University v. Villanova Alumni Educational Foundation*,
    123 F. Supp.2d 293 (E.D. Pa. 2000) .....................................................................19

*Windows User, Inc., v. Reed Bus. Pub. Ltd.*,
    795 F. Supp. 103 (S.D.N.Y. 1992) .......................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................................28

The Trustees of Columbia University in the City of New York ("Columbia") and Elton Daniel respectfully submit this post-hearing memorandum of law in opposition to Encyclopaedia Iranica Foundation, Inc.'s motion for a preliminary injunction.

## PRELIMINARY STATEMENT

For nearly 40 years, Columbia University has produced, edited, supported, and published the *Encyclopaedia Iranica*, a highly regarded scholarly resource of Persian and Iranian history and culture, through its Center for Iranian Studies.  Columbia first used the mark "ENCYCLOPAEDIA IRANICA" in connection with the publication in 1982, when the first fascicle of the *Encyclopaedia* was published.  (Tr. 69:2-3; Exs. S at 1, JJJ at 1).  The name "Columbia University" appeared prominently on the front cover of that first fascicle 38 years ago, and the University's name has been on the front cover of every one of the 106 fascicles that has been published over the decades. (Tr. 258:23-25; Ex. S).

Columbia has supported the publication in countless ways, including by providing editorial support, administrative support, office space, grant sponsorship, and the services and resources of its extensive university library system.  (Tr. 272:25-273:10; Ashtiany Decl. ¶¶ 13-14).  The Editor-in-Chief of the *Encyclopaedia* has always been the Director of the Center for Iranian Studies at Columbia (Exs. JJ at 1-2, O at 1), and Columbia employed and paid the key research scholars, editors, and staff responsible for the content and quality of the *Encyclopaedia* (Ex. KK).  Columbia also provided the project with millions of dollars of support through federal grants that had been awarded *to the University* by the National Endowment for the Humanities.  (Ex. OOO).  Columbia staff solicited the scholars who contributed articles to the publication (Exs. X, Y, AA, BB); Columbia research scholars edited the articles for publication (Tr. 262:19-263:22); and Columbia finance personnel paid these authors their honoraria from Columbia funds (Exs. DD-II).  The

*Encyclopaedia* owes the stellar reputation it enjoys today in no small measure to the publication's long-standing and highly public affiliation with Columbia University, a world-renowned research institution.  (Daniel Decl. ¶ 16; Ashtiany Decl. ¶ 13).

In this action, a small nonprofit that was established in 1990 to raise money for the publication is seeking to wrest control of the publication from the University, attempting to use the legal system to stop the publication of the 107th fascicle.  An organization currently dominated by a small group of Wall Street bankers with no serious academic credentials or credibility (Tr. 25:7-13, 191:1-12), the Encyclopaedia Iranica Foundation ("EIF") has made a series of demonstrably false claims in an effort to persuade the Court that EIF, and not Columbia, is entitled to use the trademark.  EIF's claims in this case are so lacking in factual support and credibility that they would be laughable were the stakes not so serious.  The evidentiary hearing held on this matter has finally exposed EIF's spurious claims as the lies they are.

**First**, EIF has falsely claimed that Columbia did not use the mark in commerce before EIF. That claim is not only demonstrably false but brazen, given that EIF **did not even exist** until Columbia had been using the mark in commerce for eight years.  (Tr. 68:20-69:8).  In fact, the name "Columbia University" appears prominently on the cover of every single one of the 106 fascicles that has been published since 1982.  (Ex. S).  Columbia also contracted with the very first publisher of the *Encyclopaedia*, Routledge & Kegan Paul Limited, in 1981 (Ex. HHH), more than nine years before EIF came into existence.  Because trademark ownership turns on first use, EIF's case fails based on this one fact alone.

**Second**, EIF has falsely claimed that Columbia University was just "an address" used by Professor Yarshater (Tr. 42:8), and a renowned research university served merely as a "landlord" or "paymaster" for EIF (Tr. 85:1-3).  Again, the hearing evidence puts the lie to these claims.  The

2

*Encyclopaedia* has been "a project of Columbia University" for nearly 40 years, a fact that EIF itself had repeatedly touted over the years, including in public tax filings. (Ex. K). As noted above, Columbia provided not only the office space to the Center but also the key editorial staff, the administrative support, the federal grant sponsorship, and access to its extensive library system. Indeed, Columbia's most valuable contribution was its substantial goodwill, as the *Encyclopaedia* enjoys the reputation it does today because of its affiliation with a world-renowned research university. To call Columbia a mere "landlord" and "paymaster," therefore, is not just insulting; it is a flat-out lie, under oath, by EIF board members who know full well that their characterization is false. EIF's related claim that it "reimbursed" all of Columbia's funding of the project is equally false. In fact, EIF has never been more than one of several entities that has donated money to Columbia to support this project over the years; indeed, two other supporters of the project, the Persian Heritage Foundation and the NEH, have provided far more financial support to the project than EIF ever has. (Ex. LL at 1).

**Third**, EIF has falsely claimed that *Professor* Yarshater is "not an employee" of Columbia. (Tr. 8:7-10). Again, the claim is flatly refuted by the hearing evidence, including Ms. Edsall's testimony and the employment records of the University. In fact, Professor Yarshater was the Kevorkian Professor of Iranian Studies from 1968 to 1990; the Chair of the Department of Middle Eastern Languages and Cultures from 1968-1973; a special lecturer at Columbia from 1990 to 2002; and the Director of the Center for Iranian Studies for the entire period from 1977 to 2016. (Edsall Decl. ¶¶ 4-5; Ex. JJ). EIF's back-up (and internally inconsistent) claim that Professor Yarshater was somehow acting outside the "scope of his employment," (Tr. 192:11-14), is equally ludicrous: He was a professor *of Iranian studies* and he led a Center *for Iranian studies*; conducting research and publishing scholarly work *on Iranian studies* was hardly a frolic and

3

detour.

**Fourth**, EIF has falsely claimed that the Center is a "nonexistent entity" that cannot hold intellectual property.   (Tr. 306:1-4).   That claim too is spurious.   The hearing evidence demonstrated that the Center is no less a part of Columbia than any other component or subdivision of the University.   Columbia University includes undergraduate schools, graduate and professional schools, a medical center, affiliated colleges and seminaries, and more than one hundred centers and institutes.   The Center for Iranian Studies is one of those centers and is therefore part of Columbia University.   (Edsall Decl. ¶ 3).   To say that the Center does not "exist" is akin to saying that Columbia Law School or the English Department of Columbia College does not exist because neither is separately incorporated.   In any event, the name "Columbia University" appears on every fascicle of the *Encyclopaedia*, and there is no question that the University itself is a legal entity.

**Finally**, EIF has falsely claimed that Professor Yarshater transferred the trademarks at issue to EIF.   The hearing evidence exposed that claim too as a lie.   Putting aside the fact that Professor Yarshater could not transfer something that he did not own, not one of the EIF witnesses could identify any document purporting to transfer any rights from Professor Yarshater to EIF.   In fact, EIF's former general counsel ***admitted*** that there was no such transfer document (Tr. 138:11-13), and EIF's treasurer went so far as to drop even the pretense of such a document during cross examination (Tr. 195:13-18).

Although EIF's claims fail for all these reasons, the Court should also deny EIF the injunction it seeks because such an order would cause serious harm to Columbia and the public, whereas denying the injunction threatens no harm at all to EIF.   As Dr. Daniel so eloquently testified at the hearing, there are "several layers of harm" caused by an order restraining the University from continuing to publish this important scholarly project after a 40-year run.   (Tr.

4

280:1-281:4).  As he explained, suppressing academic research works a profound disservice to students, teachers, researchers, journalists, policy makers, and the general public.  (Tr. 280:1-9). It also harms the authors who contributed to the fascicle that has been enjoined from publication, whose careers depend upon publication, as well as over 200 other authors whose work is on hold. (Tr. 280:20-281:4).  An injunction also harms the Center, by undermining its credibility within the academic community.  (Tr. 280:23-281:4).  As Dr. Daniel also testified, an injunction would essentially destroy the *Encyclopaedia*, an outcome that alone would be devastating and tragic but would also call into question the Center for Iranian Studies at Columbia as a viable academic enterprise.  (Tr. 280:10-281:4).

In contrast to those very real harms to Columbia, authors, students, teachers, and the public generally, EIF identifies no real harm that would come to it from continued publication of this acclaimed academic work.  At most, it claims that its fundraising has been down in recent years as a result of this dispute.  But diminished donations simply do not constitute irreparable harm.  And in any event, EIF presented no evidence to support that claim; to the contrary, the evidence refuted it, as the testimony and documents established that EIF's fundraising had been diminished for years before this dispute arose.  (Tr. 195:25-196:14).  Finally, while EIF claims that "confusion" will occur if the publication is not enjoined, it again produced no evidence to support that conclusory statement, and whatever confusion that exists today was manufactured by EIF itself by claiming to own a publication that it simply does not own.

For all these reasons, the motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

A.    Columbia University's Center for Iranian Studies

A world-renowned academic and research institution, Columbia University includes three

undergraduate schools, thirteen graduate and professional schools, a medical center, four affiliated colleges and seminaries, at least twenty-five libraries, and more than one hundred research centers and institutes.  (Edsall Decl. ¶ 3).  The Center for Iranian Studies, now called the Yarshater Center for Iranian Studies (the "Center"), is one of those centers and is therefore part of Columbia University.  (Edsall Decl. ¶ 3; Tr. 214:3-12; 256:10-21; Ex. MM at 1).

In or around 1977, Professor Ehsan Yarshater was appointed by Columbia as the Director of the Center.  (Ex. JJ at 1; Tr. 214:25-215:5).  At that time, Professor Yarshater was the Hagop Kevorkian Professor of Iranian Studies at Columbia, a position he held from 1960 until 1990.  (Ex. JJ at 1; Edsall Decl. ¶ 4).  From 1991 to 2002, Professor Yarshater served as a Special Lecturer at Columbia.  (Ex. JJ at 2; Edsall Decl. ¶ 4).  Professor Yarshater retired from teaching responsibilities in 2002, but he continued to serve as the Director of the Center until late 2016, and remained a Professor Emeritus at Columbia until his death in 2018.  (Ex. JJ at 2; Tr. 214:25-215:5; 231:9-10; Edsall Decl. ¶ 5).  Like other center directors at Columbia, Professor Yarshater did not receive a salary for his role as Center Director.  (Tr. 223:10-13; Edsall Decl. ¶ 4).  But this position was the result of an administrative appointment by Columbia, which made him subject to University policies and procedures, just as any other center director or department chair.  (Tr. 215:6-10; 225:3-5).  As the Director of the Center, Professor Yarshater was overseen by Columbia in the hiring, appointment, review, and management of researchers at the Center.  (Tr. 225:6-12).

In January 2017, Columbia appointed Professor Elton Daniel, a highly-regarded scholar of Middle Eastern and Islamic History, who had served as Associate Editor of the *Encyclopaedia* from 1997 to 2001, as the Interim Director of the Center.  (Ex. O; Tr. 215:14-16; 256:2-7).

B.    Columbia's First Use of the Encyclopaedia Iranica Mark

Since 1982, the Center has produced the *Encyclopaedia Iranica*—an ongoing scholarly

resource on Persian and Iranian history.  (Tr. 69:2-3; 257:25).  The *Encyclopaedia* has been published continuously since 1982 and, to date, 106 fascicles of the *Encyclopaedia* have been published.  (Daniel Decl. ¶ 7; Tr. 258:4-5).  Each fascicle cover has borne the name "ENCYCLOPAEDIA IRANICA."  (Ex. S; Tr. 258:20-22; Daniel Decl. ¶ 7).  Each fascicle cover has also borne the name "Center for Iranian Studies Columbia University," signifying that the *Encyclopaedia* has been prepared under the auspices of Columbia University.  (Ex. S; Tr. 258:23-259:5; Daniel Decl. ¶ 7).

The first fascicle of the *Encyclopaedia* was published on behalf of Columbia by Routledge & Kegan Paul Limited ("Routledge"), which served as the *Encyclopaedia*'s publisher until approximately 1990.  (Tr. 259:6-11; Ex. S at 1-94).  The contract with Routledge was signed by Professor Yarshater in his capacity as Director of the Center at Columbia.  (Ex. HHH at 1).  And a Routledge announcement regarding the publication of the first volume of the *Encyclopaedia* in 1984 identified it as a product of the "Center for Iranian Studies" of "Columbia University."  (Ex. JJJ at 1)*.*

C.    Columbia's Editorial Control Over the Encyclopaedia

Through the Center, Columbia has always been solely responsible for the content of the *Encyclopaedia*.  (Tr. 268:14-21; Ex. SS at 2; Ashtiany Decl. ¶ 6; Daniel Decl. ¶ 7).  As Dr. Daniel explained, the creation of the *Encyclopaedia* involves a three-stage process—all of which is carried out at Columbia under the direction of the Director of the Center.  (Tr. 262:19-263:22).  First, the editors at the Center work with the *Encyclopaedia*'s network of consulting editors and its International Advisory Board to identify topics for articles and scholars qualified to author an article on that topic.  (Daniel Decl. ¶ 10; Ashtiany Decl. ¶ 7; Tr. 262:22-263:9).  Once the Center has decided on a topic for an article, Columbia personnel send invitations to prospective authors.

(Daniel Decl. ¶ 11; Ashtiany Decl. ¶ 8; Exs. X-BB; Tr. 263:5-9).

Once a draft article is submitted, it then goes through a rigorous editorial process.  (Tr. 263:9-11; Ashtiany Decl. ¶ 9; Daniel Decl. ¶ 13).  The editors at the Center attempt to verify every factual statement in an article, ensure that it is free of any biases, and that it has a complete bibliography.  (Ashtiany ¶ 9; Tr. 263:11-19).  When an article has been edited to the point where both the author and editor are satisfied, the article is prepared for publication, which involves another round of proofreading to make sure it is suitable for publication.  (Tr. 263:17-22).  Once accepted for publication, the author is paid an honorarium, which is funded by Columbia. (Ashtiany Decl. ¶ 11; Exs. DD-II).

In the 40 years that the *Encyclopaedia* has been published, the process of creating the *Encyclopaedia* has remained the same, and the editorial processes and standards that were adhered to by Professor Yarshater are the same as those maintained by Dr. Daniel today.  (Daniel Decl. ¶ 8; Ashtiany Decl. ¶ 10; Tr. 263:23-264:21).  Under both Professor Yarshater and Dr. Daniel, it has been employees of the Center that have been responsible for the quality of the *Encyclopaedia*.  (Tr. 268:14-21; Daniel Decl. ¶ 7; Ashtiany Decl. ¶¶ 6-12; Ex. SS at 2; Ex. C at 7-9).

That the editorial process is conducted by Columbia is critical to the *Encyclopaedia*'s reputation as an esteemed academic publication and its ability to attract distinguished authors and contributors.  (Ashtiany Decl. ¶ 13; Tr. 274:11-14; Ex. N at 1-2).  As Dr. Daniel explained, the *Encyclopaedia*'s affiliation with Columbia allows it to attract the strongest academic contributors because "publishing in a publication sponsored by Columbia with Columbia's name on it is a very valuable thing and advances an academic career."  (Tr. 274:11-14; *see* Ashtiany Decl. ¶ 13).  The affiliation with Columbia also gives the *Encyclopaedia* credibility that it would not otherwise have. (Tr. 274:14-19; Ashtiany Decl. ¶ 13).  Professor Yarshater highlighted the importance of the

*Encyclopaedia*'s affiliation with Columbia in grant applications, explaining that the fact that "***there is a research Center at Columbia University*** preparing and processing informative articles on Iran, Afghanistan, Central Asia . . . etc., has attracted a number of invitations for our staff not only to speak about and explain the [*Encyclopaedia*] but also to provide substantive information on the topics covered by the [*Encyclopaedia*]."  (Ex. SS at 22) (emphasis added).

  D. <u>Professor Yarshater Forms EIF as an Additional Funding Source for the *Encyclopaedia*</u>

Professor Yarshater founded EIF in 1990 – *i.e., **eight years*** after Columbia first published the *Encyclopaedia* and began using the "ENCYCLOPAEDIA IRANICA" mark.  (Ex. 3 at 2; Tr. 68:20-69:8; Ex. S at 1-3).  EIF did not make its first donation to the Center until June 1993, after Columbia had already published six volumes of the *Encyclopaedia*.  (Ex. LL at 2; Ex. S at 1-136).

Since its inception, EIF's role has been to raise money for the *Encyclopaedia*, not to develop its scholarly content.  (Ex. 3 at 4; Tr. 268:18-269:3).  As EIF has explained in public documents, "the Center for Iranian Studies at Columbia carries out the academic functions of the *Encyclopaedia*, while the Foundation concentrates on raising funds for the project."  (Ex. C at 8).  Specifically, in its 2008 Annual Report, EIF made the following statements regarding the respective roles of Columbia and EIF in connection with the *Encyclopaedia*:

- "The *Encyclopaedia Iranica* is a project of Columbia University's Center for Iranian Studies."  (Ex. C at 5).

- "[T]he Foundation supports the project but does not carry it out. . . .  [T]he Foundation limits itself to maintaining the financial health of the project by raising funds for its operating budget and by backing it with an endowment fund."  (Ex. C at 9).

- "The project is carried out by the Center for Iranian Studies at Columbia University and is funded by donations of supporters and grants obtained by that Center (in consultation with the Foundation) as well as funds provided directly by [EIF]."  (Ex. C at 9).

- "[EIF is] not involved in the academic and technical aspects of the project." (Ex. C at 9).

In its nonprofit filings with the IRS and New York Attorney General, EIF again described itself as a "major funder of the *Encyclopaedia Iranica* project at Columbia University's Center for Iranian Studies" (Ex. K at 33), and stated that EIF's purpose is to "promote the cause of the *Encyclopaedia Iranica*, a Columbia University project" (Ex. K at 34). And an archived page from a 2013 version of EIF's website stated that the "*Encyclopaedia Iranica* is a project of Columbia University and is prepared at its Center for Iranian Studies." (Ex. C-13 at 2). Professor Yarshater himself described the *Encyclopaedia* as a "project of Columbia University" that "is prepared for publication at its Center for Iranian Studies." (Ex. W at 313).

While EIF was a significant donor to the *Encyclopaedia* between 1993 and 2017, it has not been the primary source of funding for the *Encyclopaedia*. Since its formation in 1990, EIF has donated approximately $5.3 million to the Center—less than the amounts Columbia received from the Persian Heritage Foundation ($12 million) and the NEH ($5.6 million). (Ex. LL at 1). Indeed, Columbia's 2010 application for a NEH grant stated that EIF was only "the ***third most important*** source of financial assistance for the [*Encyclopaedia Iranica*] project, aside from the generous and continuous support of both Columbia University and the NEH." (Ex. SS at 21 (emphasis added); Ex. VV at 28). Each of EIF's donations was designated in Columbia's records as a "gift," which is a form of "private, voluntary support" and not a reimbursement for specific expenses. (Ex. LL at 2; Tr. 237:16-238:3). Indeed, the donation checks from EIF state on their face either that they are a "Donation" or a "Grant." (Exs. ZZ-FFF). There is no evidence that Columbia ever submitted a reimbursement request to EIF for specific expenses incurred by the Center. (Tr. 238:16-22; 289:13-24).

While at one time EIF's board included academics, the current chair of the board, Ramine

10

Rouhani, is a Wall Street banker with stints at Goldman Sachs and Lehman Brothers; he is not a scholar of Middle Eastern history.  (Tr. 25:7-13; 67:9-68:1).  Mr. Rouhani acknowledged that he "was not really close with Ehsan Yarshater."  (Tr. 25:14-18).  Likewise, EIF's current treasurer, Soody Nelson, worked on Wall Street for over 30 years; she too is a banker, not a scholar.  (Tr. 191:1-12).  It is thus unsurprising that Mr. Rouhani testified that the EIF board does not perform any direct "quality control" of the articles published in the *Encyclopaedia*.  (Tr. 74:20-75:4 ("If your question is if the member[s] of the board performed quality control on the articles, the response is no, that wasn't our job.")).  Indeed, Mr. Rouhani acknowledged that he is not familiar with the substance of the publications in the *Encyclopaedia* and that he has merely "seen a few of the articles."  (Tr. 51:5-6; 66:22-67:2).

> E.     Dr. Daniel Is Appointed by Columbia as the Interim Director of the Center

In or around 2015, Professor Yarshater began recruiting Dr. Daniel to take over the leadership of the Center.  (Daniel Decl. ¶ 3).  Dr. Daniel had previously served as an Associate Editor of the *Encyclopaedia* from 1997 to 2001, working closely with Professor Yarshater.  (Daniel Decl. ¶ 2; Tr. 256:2-7).  Dr. Daniel interviewed for the position of Interim Director of the Center with two Columbia officials and he was appointed by Columbia as a Senior Research Scholar at the Center, effective January 15, 2017.  (Ex. O at 1; Tr. 253:23-254:4; Daniel Decl. ¶ 4).  The appointment was made by the Executive Vice President for Arts and Sciences at Columbia, and Dr. Daniel's appointment letter stated that his responsibilities included "directing the research activities in the Center for Iranian Studies, in particular, the Encyclopedia Iranica."  (Ex. O at 1).  Although Dr. Daniel had a discussion with Mr. Rouhani and Ms. Nelson prior to his appointment, no one at EIF interviewed Dr. Daniel for the job.  (Tr. 290:16–291:18).  Indeed, EIF's general counsel, Kamran Parandian, has acknowledged that "EIF cannot hire/appoint someone on behalf

of Columbia, it can only make a recommendation and the final determination is with Columbia."
(Ex. P at 1).  Mr. Parandian further acknowledged that Dr. Daniel was hired **by Columbia** as "the
Interim Director of the Center and Editor-in-Chief of the Iranica Project."  (Ex. P at 1).  Since
being appointed at the Center, Dr. Daniel has been employed exclusively by Columbia.  (Daniel
Decl. ¶ 4).  He receives a salary from Columbia and has never received a salary from EIF.  (Tr.
255:23–256:1; Ex. KK at 2).

Professor Yarshater enthusiastically supported Dr. Daniel's appointment as the Interim
Director of the Center.  (Ex. Q; Daniel Decl. ¶ 5).  On December 16, 2016, Professor Yarshater
sent an email to Dr. Daniel and others stating that he was "very happy" to welcome Dr. Daniel as
the new Director of the Center and Editor-in-Chief of the *Encyclopaedia,* declaring that "[t]his is
a new day for the *Encyclopædia Iranica,* a day to celebrate."  (Ex. Q).  Members of EIF were also
initially supportive of Dr. Daniel's appointment and expressly acknowledged that it was Columbia,
and not EIF, that appointed him.  (Ex. R at 1).  In January 2017, Mr. Rouhani sent an email to the
EIF Board stating that Dr. Daniel has been appointed "**by Columbia** as the Interim Director of the
Center and Editor-in-Chief of the *Encyclopædia Iranica*."  (Ex. R at 1) (emphasis added).  He
stated that "[f]or many years now, the *Encyclopædia* has consistently benefited from Professor
Daniel's impressive contributions as an erudite scholar with a formidable knowledge of Iranian
culture as well as proven qualities as an able and energetic administrator."  (Ex. R at 1-2).

F.      EIF Attempts to Rewrite the History of the *Encyclopaedia*

In or around January 2018, Professor Yarshater began discussions with PHF regarding a
proposal to endow and rename the Center.  (Daniel Decl. ¶ 18; Tr. 274:21-25).  EIF requested and
received an opportunity to participate in those discussions, and Professor Yarshater ultimately
proposed that PHF and EIF both contribute to an endowment to support the Center.  (Tr. 274:21-

12

275:3; Ex. U at 1; Daniel Decl. ¶ 18).  Following these discussions, Columbia presented a proposal to EIF, under which EIF would contribute $5.5 million to the endowment.  (Tr. 56:19-57:2).  At that time, and since then, the Wall Street bankers who controlled EIF had amassed approximately $18 million that had been raised for the very purpose of supporting the *Encyclopaedia*.  (Tr. 68:2-7; Ex. N at 3).  Nevertheless, EIF rejected the proposal—which it now characterizes as a "demand"—and has not made a single contribution to Columbia since June 2017.  (Tr. 56:19-24; 57:8-9; Ex. LL at 2).

Following this rift with Columbia, EIF began attempting to rewrite the history of the *Encyclopaedia* to mislead the public about Columbia's and EIF's respective roles.  For example, EIF removed from the Iranica Online website the FAQ page that described the *Encyclopaedia* as "a project of Columbia University" that is "prepared at its Center for Iranian Studies."  (Ex. C-13 at 2).  In its place, EIF now falsely describes the *Encyclopaedia* as "an international, collaborative research project of the Encyclopaedia Iranica Foundation, Inc."  (*See* https://iranicaonline.org/pages/about (last visited Sept. 3, 2020)).  And whereas EIF's public tax filings prior to the rift described its mission as "funder" of "the Encyclopaedia Iranica Project at Columbia University's Center for Iranian Studies" (Ex. K at 33), the description of its mission in its November 2019 filing no longer mentions Columbia at all.  (Ex. N at 30).  EIF also, incredibly, now maintains that Columbia provided only "payroll and fringe benefit management" for EIF and that it paid Columbia a 10% "administrative fee" for those services.  (Tr. 28:1-4; 29:24-25; 85:1-13).  EIF presented zero evidence of this purported arrangement, however, and Mr. Rouhani admitted at the hearing that there has never been any such service contract between Columbia and EIF.  (Tr. 36:13-15).

13

G.      EIF Interferes With Columbia's Efforts to Publish the Work

Since 2017, EIF has also taken aggressive steps to commandeer the *Encyclopaedia*, including by preventing Columbia from publishing it, both online and in print.  In 2018, the company that hosted the on-line version of the *Encyclopaedia* blocked Columbia's administrative access to the website, after EIF falsely claimed to own the domain.  (Tr. 265:3-9; Daniel TRO Decl. ¶ 23[1]).  Consequently, Columbia has not been able to publish via the website since June 2018.  (Daniel TRO Decl. ¶ 23; Tr. 265:3-9).

With regard to print publication, Columbia has contracted with Brill, a Dutch international academic publisher well known for its publications in Middle Eastern and Islamic studies.  (Daniel TRO Decl. ¶ 24).  In February 2018, EIF wrote to Brill stating that it had become aware that Dr. Daniel "is in negotiation with Brill on a proposed publishing contract that will include the Encyclopaedia Iranica publications." (Ex. 12 at 1).  EIF took no legal action to stop Brill from publishing Fascicle 4 of Volume 16, however, which it did in October 2018.  (Tr. 279:11-12; Ex. S at 308-310).  In April 2019, EIF again wrote to Brill, demanding that Brill "immediately cease from advertising, publishing, and/or distributing copies" of the "unauthorized Encyclopaedia Iranica fascicle."  (Ex. 32 at 2).  EIF again took no legal action and Columbia and Brill proceeded to publish Fascicle 5 in October 2019. (Tr. 278:24-25).

H.      EIF's 2019 Registration of the Mark and Columbia's Challenge

After the rift with Columbia, EIF for the first time sought to register the "ENCYCLOPAEDIA IRANICA" mark with the United States Patent and Trademark Office ("PTO").  (Tr. 83:4-21; Ex. 1.1).  Although EIF knew that it was not the exclusive owner of the

---

[1] Citations to the "Daniel TRO Decl." are to the July 28, 2020 Declaration of Elton L. Daniel, filed in opposition to EIF's application for a temporary restraining order.  (ECF No. 81).

mark, EIF's application to the PTO falsely represented that no other person had rights to the mark and that the mark was first used in 2003 (Ex. 1.1 at 16).  As EIF well knew, Columbia had first used the mark as early as 1982.  Relying on the false information in the trademark application, the PTO registered the trademark effective October 8, 2019.  (Ex. 1.1 at 1).  On October 31, 2019, Columbia promptly petitioned the PTO for cancellation of EIF's trademark, alleging fraud on the PTO.  (Declaration of Megan E. Whitehill, dated July 28, 2020, ECF No. 83 ("Whitehill Decl."), Ex. B).  Columbia's petition to cancel remains pending.  (Whitehill Decl., Ex. C).

## ARGUMENT

## I.     EIF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

EIF's efforts to enjoin the publication of the *Encyclopaedia* after an uninterrupted 40-year run should be denied.  A preliminary injunction is an "extraordinary and drastic remedy" that "should not be granted unless the movant, by *a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and citations omitted). To obtain a preliminary injunction, the moving party must show "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted).  The moving party must also show that a preliminary injunction "is in the public interest."  *Id*.  A showing of irreparable harm is "'[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.'"  *Hello I Am Elliot, Inc. v. Sine*, No. 19 Civ. 6905 (PAE), 2020 WL 3619505, at *14 (S.D.N.Y. July 2, 2020) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  EIF cannot come close to meeting this exacting standard.

A.   **EIF Cannot Demonstrate Irreparable Harm**

1.   EIF's Delay in Seeking Injunctive Relief Requires Denial of Its Motion

As a threshold matter, EIF's delay in seeking injunctive relief compels denial of this motion.  As the Second Circuit has explained, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Thus, the failure to act promptly in seeking injunctive relief "may, standing alone, . . . preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (citations omitted).

In trademark cases, courts in this Circuit "typically decline to grant preliminary injunctions in the face of unexplained delays of more than **two months**."  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (emphasis added).  In *Tough Traveler,* for example, the Second Circuit vacated the district court's grant of a preliminary injunction where the plaintiff had waited nine months after learning of the alleged infringement before suing, and an additional four months before moving for a preliminary injunction.  60 F.3d at 967.  While there is normally a "presumption of irreparable harm" in trademark cases when a plaintiff shows "a high probability of confusion," the court stressed that "any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."  *Id*. at 967-68; *see also Citibank,* 756 F.2d at 275-76 (vacating district court's grant of preliminary injunction where the plaintiff did not seek injunctive relief until "more than ten weeks" after learning of the defendant's plans to open an office with an allegedly infringing name and "more than nine months" after it received notice through the press that the defendant

intended to open the office).

Here, EIF had known about Columbia's plans to continue publishing the *Encyclopaedia* through Brill for nearly **two-and-a-half years** before seeking injunctive relief.  In February 2018, Mr. Rouhani wrote to Brill stating that EIF had become aware that Dr. Daniel "is in negotiation with Brill on a proposed publishing contract that will include the Encyclopedia Iranica publications." (Ex. 12 at 1).  Despite knowing that Columbia intended to continue publishing the *Encyclopaedia* using Brill, EIF took no legal action to stop the publication of Fascicle 4, which Brill did in October 2018.  (Tr. 279:11-12; Ex. S at 308-10).  And in April 2019, EIF again wrote to Brill, demanding that Brill "immediately cease from advertising, publishing, and/or distributing copies" of the "unauthorized Encyclopaedia Iranica fascicle" (Ex. 32 at 2).  EIF again took no legal action and Columbia and Brill proceeded to publish Fascicle 5 in October 2019.  (Tr. 278:24-25; Ex. S at 311-13).  EIF's failure to act sooner underscores the absence of harm from publication or urgency to the instant application.

It was not until July 24, 2020 – just **one week** prior to the publication of Fascicle 6 – that EIF first sought a TRO.  By that time, it had been more than **two-and-a-half years** since learning of Columbia's plans to continue publishing the *Encyclopaedia* using Brill, more than **fifteen months** since EIF sent a cease and desist letter to Brill, and more than **ten months** since EIF filed its complaint in this action.  (Exs. 12, 32).  Courts in this Circuit routinely find that delays in seeking preliminary injunctive relief much shorter than this require the denial of a preliminary injunction.  *See Tough Traveler*, 60 F.3d at 80; *Citibank*, 756 F.2d at 276; *see also Hello I Am Elliot,* 2020 WL 3619505, at *15 (citing cases).

2. <u>Columbia's Publication of the Fascicle Does Not Constitute Irreparable Harm</u>

EIF also has not established that it would be harmed, much less irreparably, if Columbia

17

continues to publish the *Encyclopaedia*.  To establish irreparable harm, a party "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  "In trademark cases, a plaintiff must show actual irreparable injury."  *Hello I Am Elliot,* 2020 WL 3619505, at *14.

Here, EIF has produced absolutely no evidence that it would be irreparably harmed in the absence of preliminary injunctive relief.  Mr. Rouhani testified at the hearing that Columbia's continued publication of the *Encyclopaedia* could lead to a drop in donations to EIF.  (Tr. 63:23-25).  But such speculative financial harm does not constitute an irreparable injury.  *See, e.g., Citizens United v. Schneiderman,* 115 F. Supp. 3d 457, 473 (S.D.N.Y. 2015) (rejecting plaintiff's assertion that certain donor disclosure obligations would result in a "chill on donations" as "highly speculative and entitled to very little weight").  In any event, EIF's own public filings demonstrate that its trouble raising money began well before its dispute with Columbia.  The last significant gift that EIF received was in 2012, when it received approximately $530,000 in public support. (Ex. K at 18).  Since then, there has been no year through 2018 in which EIF raised more than $80,000.  (Ex. N at 16).  Significantly, even though Columbia published Fascicle 4 in 2018 (Tr. 279:11-12), EIF's donations actually increased from 2017 to 2018.  (Ex. N at 16 (listing $59,707 in donations in 2017 and $65,953 in donations in 2018)).  Even if financial harm could qualify as irreparable, the evidence directly refutes EIF's claim that Columbia's continued publication of the *Encyclopaedia* would negatively impact EIF's donations.

Moreover, in trademark cases, courts have consistently rejected the arguments of nonprofits based on mere harm to their ability to raise funds.  In *Potomac Conference Corp. of*

*Seventh-Day Adventists v. Takoma Academy Alumni Association, Inc.*, 2014 WL 857947 (D. Md.
Mar. 4, 2014), for example, a school sued an alumni association that had been formed to raise
money for the school.  Upon finding that the school owned the trademark, the court rejected the
alumni association's argument that it would "die" if it could no longer raise funds to support the
school, observing that the risk of harm to the school from the defendant's use of its name
outweighed the alleged harm to the alumni association's fundraising efforts.  *Id.* at *20-*21.  *See
also Villanova University v. Villanova Alumni Educational Foundation*, 123 F. Supp. 2d 293, 311
(E.D. Pa. 2000) (rejecting the argument that a non-profit formed to raise funds for a university
would be unable to pursue its fundraising mission if it was prevented from using the trademarks,
observing that "[o]ne who uses another's marks without permission can hardly claimed to be
harmed, since it brought any and all difficulties . . . upon itself.") (internal quotation and citation
omitted).   Likewise here, EIF's alleged fundraising difficulties are entitled to no weight because,
to the extent they exist at all, they are entirely self-inflicted:  EIF abandoned its very mission as a
charitable organization when it voluntarily chose to stop funding the *Encyclopaedia*.

There is also no factual support for Mr. Rouhani's conclusory claim that publication of the
two most recent fascicles has "create[d] confusion on the contributor side," because it is "unclear
where they are to go."  (Tr. 63:19-23).  To the contrary, for nearly 40 years, contributors to the
*Encyclopaedia* have dealt exclusively with the editors and staff at the Center—not with EIF.  (*See*
Tr. 279:4-10; Exs. X-II).  And for nearly 40 years, the academic community has come to associate
the *Encyclopaedia* with Columbia—not EIF.  (Ashtiany Decl. ¶ 13).  As Professor Rahim
Shayegan, the Director of the Program of Iranian Studies at UCLA, recently stressed in an email
to Dr. Daniel, the *Encyclopaedia*'s "quality and reliability is associated with the editorial board
they know, now the Yarshater Center, and Columbia as an institution."  (Ex. T at 1-2).  And it is

the *Encyclopaedia*'s longstanding association with Columbia that has generated the "intellectual capital" that it carries with contributors.  (Ex. T at 1).  Thus, confusion in the academic community will result only if Wall Street bankers with no background in Middle Eastern scholarship are permitted to end Columbia's 40-year run of publishing this acclaimed scholarly work.

### B. EIF Cannot Establish A Likelihood of Success on the Merits or Even Sufficiently Serious Questions Going To The Merits

EIF also cannot establish a likelihood of success on the merits, or even sufficiently serious questions going to the merits of its claims.  As courts have explained, a plaintiff's burden under the "sufficiently serious question" standard "is no lighter than the one it bears under the 'likelihood of success' standard" because the plaintiff "must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  Here, EIF has not satisfied either standard.

#### 1. Columbia Has Priority of Use of the Mark

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works v. RMC Int'l,* 96 F.3d 1217, 1219 (9th Cir. 1996).  "Thus, so long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).  To establish "use," a party must show that it was using the mark in commerce "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."  *Windows User, Inc., v. Reed Bus. Pub. Ltd.*, 795 F. Supp. 103, 108 (S.D.N.Y. 1992).

Here, it is undisputed that Columbia and its Center for Iranian Studies first used the mark

"ENCYCLOPAEDIA IRANICA" in 1982—*eight years* before EIF was formed.  (Ex. S; Tr. 68:20-69:8, 84:2-4, 257:24-25).  Professor Yarshater conceived of and developed the *Encyclopaedia* in the late 1970s and early 1980s while he was a tenured professor at Columbia and its Director of the Center for Iranian Studies.  (Exs. W at 1-12, JJ at 1).  The hearing evidence also demonstrates that Columbia has continuously used the mark in commerce over the last 40 years.  The cover of every one of the 106 fascicles of the *Encyclopaedia* that has been published to date has borne the name "ENCYCLOPAEDIA IRANICA" as well as the name "Center for Iranian Studies Columbia University."  (Ex. S; Tr. 258:20-25; Daniel Decl. ¶ 7).  As Dr. Daniel testified, this signifies that the *Encyclopaedia* "has been prepared under the auspices of the Center of Iranian Studies at Columbia University."  (Tr. 258:23-259:5).

Indeed, Professor Yarshater's actions from the publication of the very first fascicle demonstrate that the *Encyclopaedia* was a product of Columbia University.  The first publication contract with Routledge from 1981—nine years before EIF came into existence—was executed by Professor Yarshater in his capacity as Director of the Center for Iranian Studies at Columbia University.  (Ex. HHH).  The public announcement by Routledge of the publication of the first volume of the *Encyclopaedia* in 1984 unambiguously identifies the *Encyclopaedia* as a product of Columbia University.  (Ex. JJJ).  Even after EIF was formed in 1990, Professor Yarshater consistently identified the *Encyclopaedia* as a "project of Columbia University" that is "prepared for publication at its Center for Iranian Studies."  (Exs. W at 2; SS at 8; VV at 15).  The NEH grant applications for the *Encyclopaedia* listed Columbia as the "Applicant" and Professor Yarshater as the "Project Director," demonstrating that Professor Yarshater communicated with NEH in his capacity as an employee of Columbia.  (Exs. SS at 2-3; VV at 8-9).  Thus, the federal grant funds received from NEH were provided to Columbia University, not to Ehsan Yarshater personally.

21

Indeed, prior to the breakdown in EIF's relationship with Columbia, EIF *itself* repeatedly described the *Encyclopaedia* as a Columbia project.  In its 2008 Annual Report, EIF described the *Encyclopaedia* as "a project of Columbia University's Center for Iranian Studies" that is "administered by a team of editors and staff members at the Center for Iranian Studies, Columbia University since 1974."  (Ex. C at 5, 7).  In its annual filings with the IRS and New York State, EIF repeatedly described the *Encyclopaedia* as a "Columbia University project."  (Ex. K at 34; Whitehill Decl. Exs. E at 31, 38, H at 43).  And an archived page from a 2013 version of EIF's website stated that the "*Encyclopaedia Iranica* is a project of Columbia University and is prepared at its Center for Iranian Studies."  (Ex. C-13 at 2).  These admissions by EIF flatly contradict its absurd contention to this Court that Columbia was a mere "landlord" or "paymaster" for EIF (Tr. 85:1-3).  It was only after the rift with Columbia in 2017 that EIF has attempted to rewrite history and recast Columbia's role in producing the *Encyclopaedia*.

Critically, the academic audience for the *Encyclopaedia* unquestionably associates the publication with Columbia:  its Editor-in-Chief has always been the Director of the Center for Iranian Studies at Columbia University and the publication has always referenced the publication's affiliation with the University on its cover page.  *See, e.g., Vanderbilt Univ. v. Scholastic, Inc.*, 382 F. Supp. 3d 734, 753 (M.D. Tenn. 2019) (finding that consumers of educational programs developed by a Vanderbilt professor, while serving as the Director of a Center at Vanderbilt, would associate those programs with the university; use of the Vanderbilt logo on program materials was "to reinforce the idea that Vanderbilt was affiliated with, directly contributed to, or created" the program).  And the evidence presented at the hearing demonstrates that the *Encyclopaedia*'s readership and contributors have been attracted to the publication precisely because of its affiliation with Columbia.  (Ashtiany Decl. ¶ 13 ("Authors have told me on numerous occasions

that they decided to contribute articles to the *Encyclopaedia* because of Columbia's reputation as a world-renowned research institution."); Tr. 279:4-10 (Dr. Daniel testifying that the readership of the *Encyclopaedia* has, for the last 40 years, thought of the *Encyclopaedia* as "a publication of the Center for Iranian Studies at Columbia University"); Ex. T (the *Encyclopaedia*'s "quality and reliability is associated with the editorial board they know, now the Yarshater Center, and Columbia as an institution")).

While Professor Yarshater executed a publishing contract with Eisenbrauns as both President of EIF and Director of the Center (Ex. 10), that does not make EIF the "user" of the mark for purposes of trademark ownership. The publishing agreement with Eisenbrauns was not signed until July 2013—over ***thirty years*** after the first publication of the *Encyclopaedia*. (Ex. 10 at 4; Ex. S at 1-3). Therefore, the testimony EIF offered from Mr. Eisenbraun has no bearing on Columbia's priority of use of the mark or its quality control over the *Encyclopaedia*. In any event, it is undisputed that, following the contract with Eisenbrauns, the cover of each fascicle continued to bear the name "ENCYCLOPAEDIA IRANICA" along with the name "Columbia University," just has it had since 1982. (Ex. S; Tr. 258:20-25). And as Mr. Eisenbraun testified, the two people he principally communicated with regarding the publication of the *Encyclopaedia* were Professor Yarshater and Ahmad Ashraf—both Columbia employees. (Tr. 155:19-156:3; 266:15-17; Ex. KK). Thus, the evidence demonstrates that it was Columbia, through the Center, and not EIF, that was directing the publishers of the *Encyclopaedia*.

The mere fact that EIF registered a trademark for "ENCYCLOPAEDIA IRANICA" in 2019, for the purposes of this litigation, does nothing to alter this analysis. As the Second Circuit has explained, "registration creates no substantive trademark rights against infringement beyond the common law rights acquired through the use of the mark." *Excelled Sheepskin & Leather Coat*

*Corp. v. Oregon Brewing Co.,* 897 F.3d 413, 419 (2d Cir. 2018) (internal quotation marks omitted).

Thus, "[t]o acquire ownership of a trademark it *is not enough to have . . . registered it first;* the

party claiming ownership must have been the first to actually use the mark in the sale of goods or

services." *Sengoku*, 96 F.3d at 1219; *see also Excelled Sheepskin*, 897 F.3d at 419

("Notwithstanding [plaintiff's] PTO registrations in 2003, 2004, 2007, and 2011, [defendant]

established its trademark rights through roughly twenty years of priority in deliberate and

continuous nationwide use of the mark since 1989."). Thus, because Columbia was the first entity

to use the "ENCYCLOPAEDIA IRANICA" mark, and has continuously used it over the last 40

years, Columbia is unquestionably the owner of the mark.

## 2.   Columbia Has Always Controlled the Quality of the Encyclopaedia

Even if there were any question of who had priority of use of the mark, Columbia would

still prevail because Columbia has at all times controlled the quality of the content of the

*Encyclopaedia*.   In cases where prior use cannot be established, courts look to which party

"controls or determines the nature and quality of the goods which have been marketed under the

mark in question." *Bell v. Streetwise Records, Ltd.*, 640 F. Supp. 575, 580 (D. Mass. 1986) (citing

*In re Polar Music Int'l AB*, 714 F.2d 1567 (Fed. Cir. 1983)).   Because the "value of a trademark

arises from its association with goods of a particular quality and source," whichever party "controls

the quality of the goods marketed under the trademark is the source and therefore owns the

trademark." *Liebowitz v. Elsevier Science Ltd.,* 927 F. Supp. 688, 696 (S.D.N.Y. 1996).

*Liebowitz* is instructive.   There, the editor-in-chief of two scientific journals sued the

publisher of those journals seeking a declaration that the plaintiff owned the "trademarks, titles,

trade dress and logos" associated with the journals. *Id.* at 695.   As Judge Kaplan explained, "[i]n

the case of scientific journals, the quality or characteristic with which the public associates the

journals must be, in essence, the nature and quality of the content of the scholarly work published in the journals." *Id.* at 696. Thus, "[w]hoever controls the nature and quality of the journals' content . . . is the source of the goods and the owner of the journal trademarks." *Id.* The court denied the defendant's motion for summary judgment, finding that a trier of fact could find that the plaintiff controlled the quality of the journals' content where the plaintiff produced evidence that (i) the plaintiff "maintain[ed] the quality and establish[ed] guidelines for acceptance and rejection [of] manuscripts"; (ii) the defendant "relie[d] on the reputation and knowledge of [plaintiff] . . . to ensure the quality of the material published . . . is maintained"; and (iii) the defendant "d[id] not attempt to assess the quality of individual papers because that is what [it has] external editors for." *Id.* at 697.

Here, likewise, control over the "nature and quality" of the work associated with the mark has remained at all times with Columbia. Specifically, the hearing evidence demonstrates that it is Columbia, through the Center, that identifies the subjects for articles, sends invitations to prospective authors, engages in the painstaking process of editing the articles, and pays honoraria to the authors. (Tr. 262:19-263:22; Exs. Y-II; Ashtiany Decl. ¶¶ 6-12; Daniel Decl. ¶¶ 7-14). Until its rift with Columbia in 2017, EIF had repeatedly admitted that it "is not involved in the academic or technical aspects of the project" and instead "concentrates on raising funds for the project." (Ex. C at 8-9; *see also* Ex. K at 34 (stating that EIF's purpose is "promote the cause of the *Encyclopaedia Iranica*, a Columbia University project")). And while EIF now claims that it controls the content of the *Encyclopaedia*, EIF's own board chair admitted at the hearing that the EIF board does ***not*** perform any direct "quality control" on the articles published in the *Encyclopaedia*. (Tr. 74:20-75:4). That is hardly surprising, given that Mr. Rouhani and Ms. Nelson are Wall Street bankers, not scholars of Middle Eastern history. (Tr. 25:7-13; 67:9-68:1).

Indeed, Mr. Rouhani testified that he is not even familiar with the substance of the publications in the *Encyclopaedia* and that he has merely "seen a few of the articles."  (Tr. 51:5-6; 66:22-67:2).

And while EIF relies heavily on Professor Yarshater's role as President of EIF after 1990, the fact that he established EIF with himself as the President only serves to underscore the fact that Columbia, through Professor Yarshater, retained control over the content of the *Encyclopaedia* even after EIF was formed in 1990.  Indeed, EIF's public filings represent that Professor Yarshater worked, on average, only five hours per week for EIF.  (Ex. K at 11; Ex. N at 9).  The remainder of his time spent working on the *Encyclopaedia*—approximately 55 hours per week—was therefore devoted to Columbia.  (Tr. 166:3-7 (EIF's treasurer testifying that Professor Yarshater worked "at least 12 hours a day" on the *Encyclopaedia*)).  Thus, the evidence demonstrates that, even after EIF was formed, Professor Yarshater's work overseeing the quality of the *Encyclopaedia* was done for Columbia.  *See, e.g., Ballet Tech Foundation v. The Joyce Theater Foundation, Inc.*, 89 U.S.P.Q.2d 1262 (T.T.A.B. 2008) (finding that ownership of the trademark of theater name belonged to dance company that controlled the "nature and quality" of the performances and not to the fundraising entity formed by the president of the dance company to raise money for the theater), *vacated as moot*, 2013 WL 6199539.

### 3. There Is No Evidence That Ownership of the Trademark Was Transferred to EIF

EIF also has produced no documentary evidence of any transfer of trademark ownership to EIF.  As an initial matter, Professor Yarshater did not have any ownership rights in the trademark to transfer.  As explained above, Professor Yarshater was a tenured professor at Columbia when the *Encyclopaedia* was first published, and for nearly 40 years the *Encyclopaedia* was created at Columbia using the Center's resources and federal grant funds provided to Columbia.  Thus, the trademark has always been owned by Columbia, not Ehsan Yarshater personally.  *See, e.g.,*

*Vanderbilt*, 382 F. Supp. 3d at 746, 752-53 (university owned intellectual property developed by professor and center director within his area of research and study); *Vanderhurst v. Colorado Mountain Coll. Dist.*, 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (materials prepared by college professor were owned by college, not professor, because materials were "connected directly with the work for which he was employed to do and was fairly and reasonably incidental to his employment").

In any event, there is no evidence that the trademark was ever transferred to EIF—either by Columbia or Professor Yarshater.  At the hearing, EIF's general counsel and treasurer each testified that there are no documents evidencing a transfer of the trademark to EIF.  (Tr. 138:11-15; 194:15-195:21).  While EIF cites a provision in its bylaws stating that one of its purposes is to hold the ownership of the *Encyclopaedia*'s trademark rights, that unilateral, self-serving declaration was not adopted or agreed to by Columbia and therefore cannot effect a transfer of rights.  Indeed, at the hearing, Mr. Ahari admitted that the bylaws were never provided to or discussed with Columbia.  (Tr. 135:20-136:4).  Thus, the mere assertion in EIF's bylaws that it owns the trademark to the *Encyclopaedia* is plainly insufficient to establish a transfer of the trademark's ownership.  *See, e.g., Nordco A.S. v. Ledes*, No. 95 CIV. 7753 (RJW), 1997 WL 570546, at *3 (S.D.N.Y. Sept. 15, 1997) (rejecting allegation that party owned trademark when there was "no document conveying title or ownership of the trademark"); *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 235 (S.D.N.Y. 2013) (finding party did not transfer trademark when it did not produce "a single contemporaneous document … to suggest that [party's] Board contemplated, discussed, or authorized a transfer").[2]

---

[2] While EIF elicited testimony at the hearing that EIF was listed on the copyright notice in certain volumes and fascicles, the Court need not reach any issues related to copyright because they have no bearing on this motion, which relates exclusively to the ownership of the "ENCYCLOPAEDIA

### C.   EIF Cannot Establish That the Balance Of Hardships Tips Decidedly in Its Favor

EIF also cannot show "a balance of hardships decidedly favoring [it]." *N. Am. Soccer League v. United States Soccer Fed'n Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  When weighing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks omitted).  "To establish that the balance of hardships tips in their favor, the plaintiffs must demonstrate that the harm they would suffer absent the relief sought is ***substantially greater*** than the harm the defendants would suffer if the injunction were granted." *Greylock Glob. Opportunity Master Fund Ltd. v. Province of Mendoza*, No. 04 Civ. 7643 (HB), 2004 WL 2290900, at *4 (S.D.N.Y. Oct. 12, 2004) (emphasis added).

Here, the hearing evidence establishes that the balance of hardships tips overwhelmingly in Columbia's favor, because entry of a preliminary injunction would irreparably damage the *Encyclopaedia*'s reputation and have the practical effect of permanently ending its publication after an uninterrupted 40-year run.  As Dr. Daniel explained, continuing to delay the publication of the *Encyclopaedia* would destroy its credibility among contributors who have submitted articles on the understanding that their work will be published under the supervision of the Center.  (Tr. 280:10-19; Daniel TRO Decl. ¶ 31).  If the *Encyclopaedia* were to lose its reputation as a publication on which authors can rely to have their work handled in a responsible and timely way, it would lose the ability to operate in accordance with the standards it has observed for the last 40 years.  (Tr. 280:20-281:4).

---

IRANICA" trademark.  In fact, there is no dispute that Columbia owns the copyrights of Fascicle 6.  And, in any event, EIF's false claims of copyright ownership of certain earlier fascicles and volumes are just as spurious as its trademark claims.

Dr. Daniel's concerns have been shared by other scholars who rely on the *Encyclopaedia* as a crucial academic resource.  Professor Shayegan, for example, explained that further delays in publishing the *Encyclopaedia* would be "compromising . . . to its prestige, and the trust innumerable authors have placed in it."  (Ex. T at 1).  Indeed, Professor Shayegan predicted that enjoining publication of the *Encyclopaedia* would likely mean the end of the *Encyclopaedia*, explaining that "it is a *mirage* to think the structures and traditions . . . at Columbia to guarantee the completion of the Encyclopaedia can be replicated elsewhere."  (Ex. T at 1).  Professor Shayegan cautioned that continuation of the *Encyclopaedia* outside of Columbia "would certainly cause the demise of the entire project and put an[] end to Yarshater's vision."  (Ex. T at 2).

By contrast, EIF has not produced ***any*** evidence of hardship—much less a balance of hardships tipping "decidedly" in its favor—that would result from Columbia's continued publication of this acclaimed publication.  As explained above, since October 2018, Columbia has published Fascicles 4 and 5 of Volume 16 using Brill, and yet EIF has produced no evidence of any injury that it suffered as a result.  Instead, the academic community has responded to those publications with the same understanding that it has had for the last 40 years—with the understanding that the *Encyclopaedia* is a publication of the Center for Iranian Studies at Columbia University.  (Tr. 279:4-10).  Like each of the 106 fascicles that has come before it, Fascicle 6 is a product of the same editorial rigor that the academic community has come to expect and associate with Columbia, and there would be no harm to EIF in allowing its publication.

### D.     A Preliminary Injunction Is Not in the Public's Interest

Finally, EIF has not shown that the issuance of a preliminary injunction is in the public's interest. "The public interest supports the publication of books." *Tr. Co. Bank v. Putman Pub. Grp., Inc.,* No. 87 Civ. 7393 (AHS), 1988 WL 62755, at *7 (C.D. Cal. Jan. 4, 1988) (denying

preliminary injunction).  When asked about the public interest in further enjoining publication of the *Encyclopaedia*, Dr. Daniel put it most eloquently, explaining that whenever the "results of serious research are suppressed," it is a "disservice to the students, to the teachers, the researchers, the journalists, the policy makers, the general public that relies on the *Encyclopaedia*."  (Tr. 280:2-9).  As Dr. Daniel explained, further delaying publication is also "a disservice to the authors who have careers depending on that publication" as well as the "over 200 other authors whose work is on hold."  (Tr. 280:2-9).

Indeed, a preliminary injunction will significantly prejudice the authors whose works are scheduled to be published, many of whom agreed to write for the *Encyclopaedia* because it is essential for their careers to have reputable, academic, peer-reviewed publication of their work. (Daniel TRO Decl. ¶ 31; Ashtiany Decl. ¶ 16). Even a brief and temporary delay in publication can do serious damage to professional careers. (Daniel TRO Decl. ¶ 31; Ashtiany Decl. ¶ 16).  And because the bulk of these articles are written for the specific needs of the *Encyclopaedia*, authors generally do not have the ability to publish their work elsewhere if there is a delay in going to press. (Daniel TRO Decl. ¶ 31).  Moreover, a further delay in publishing the *Encyclopaedia* would negatively impact the researchers, teachers, students, and other users who depend on access to the *Encyclopaedia*'s existing and new research. (Daniel TRO Decl. ¶ 35).

In sum, publication of the *Encyclopaedia Iranica* unquestionably serves the public interest. Blocking that publication based on the spurious claims of EIF, which have now been proven false, would work a serious injustice.

## **CONCLUSION**

The Court should deny EIF's Motion for a Preliminary Injunction.

Dated:    September 3, 2020
           New York, New York

                                        Respectfully submitted,

                                        BUCKLEY LLP

                                        /s/ Andrew W. Schilling
                                        Andrew W. Schilling
                                        Daniel R. Alonso
                                        Brian J. Wegrzyn
                                        Megan E. Whitehill
                                        Alyssa M. Helfer
                                        1133 Avenue of the Americas, Suite 3100
                                        New York, New York 10036
                                        Tel:  (212) 600-2330
                                        aschilling@buckleyfirm.com

                                        Amanda R. Lawrence
                                        Benjamin B. Klubes (*pro hac vice*)
                                        2001 M Street NW, Suite 500
                                        Washington, DC 20036
                                        Tel: (202) 349-8000

                                        *Attorneys for The Trustees of*
                                        *Columbia University in the City of New*
                                        *York and Elton Daniel*