**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>*Plaintiff*,<br><br>v.<br><br>ENCYCLOPAEDIA IRANICA FOUNDATION, INC.,<br><br>*Defendant*. | Case No.: 1:19-cv-07465-AT-KF |
| ENCYCLOPAEDIA IRANICA FOUNDATION, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, ELTON DANIEL, AND BRILL USA, INC.,<br><br>*Defendants*. | Case No.: 1:19-cv-08562-AT-KF |

**ENCYCLOPAEDIA IRANICA FOUNDATION, INC.'S POST-HEARING BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.   INTRODUCTION ................................................................................................... 1

II.  Statement of facts ................................................................................................... 1

   A.   EIF obtained rights in the ENCYCLOPÆDIA IRANICA mark through use and as the successor-in-interest to Dr. Yarshater. .......................................................... 1

      (1)   Dr. Yarshater was the creator and original owner of the mark. .................................. 1

      (2)   Dr. Yarshater controlled the production, content, and quality of the marked products as Editor-in-Chief of the *Encyclopaedia Iranica*. ................................................. 2

      (3)   Dr. Yarshater was not paid by Columbia for his work as the Editor-in-Chief of the *Encyclopaedia Iranica* nor as the Director of the Center for Iranian Studies. ........................ 5

      (4)   Dr. Yarshater created EIF to oversee and publish the *Encyclopaedia Iranica* and to hold all trademarks and copyrights for this work. ................................................. 6

      (5)   EIF contracted with third parties for the online version of the *Encyclopaedia Iranica* and for the content management thereof. ......................................................... 8

      (6)   EIF maintained control over the *Encyclopaedia Iranica* and ownership of related intellectual property after Dr. Yarshater retired. ................................................. 9

      (7)   EIF owns a federal trademark registration for the ENCYCLOPÆDIA IRANICA mark.   10

      (8)   Columbia never affixed the ENCYCLOPÆDIA IRANICA mark on any publications nor has it ever published or distributed the *Encyclopaedia Iranica* prior to the present dispute.   11

      (9)   Defendants' recent marketing of competing products bearing the ENCYCLOPÆDIA IRANICA mark has caused actual confusion. ..................................................... 11

   B.   EIF owns indisputable federal copyright registrations for Volumes XI–XVI. .................. 13

      (1)   Dr. Yarshater selected and arranged the articles included in each volume of the *Encyclopaedia Iranica* while Editor-in-Chief of the work. ........................................ 13

      (2)   Dr. Yarshater directed the filing of federal copyright applications for the *Encyclopaedia Iranica.* ........................................................................... 13

III. APPLICABLE LAW ............................................................................................ 14

   A.   A preliminary injunction will preserve the *status quo ante*. .................................. 14

   B.   EIF has satisfied the elements required for a preliminary injunction. ......................... 15

      (1)   EIF is likely to win on the merits or, at least, has raised serious questions going to the merits to make them a fair ground for litigation. ................................................. 16

         (a)   EIF is the owner of the ENCYCLOPÆDIA IRANICA mark. ............................ 16

i

(b)      Defendants are marketing a counterfeit product that features an imitation of EIF's ENCYCLOPÆDIA IRANICA mark.............................................................................. 23

(c)   EIF is likely to prevail on its trademark counterfeiting and infringement claims, and has raised serious questions going to the merits to make them a fair ground for litigation.23

(d)      Defendants are barred from challenging EIF's copyrights for the *Encyclopaedia Iranica*. ........................................................................................................................ 27

(2)      EIF has demonstrated that it is likely to suffer irreparable harm absent a preliminary injunction. .................................................................................................................................... 28

(3)      The balance of hardships tips in EIF's favor. .......................................................... 29

(4)      The public interest would be served with a preliminary injunction. ........................ 30

IV.  CONCLUSION ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
 408 F. Supp. 3d 424 (S.D.N.Y. 2019)........................................................................23

*Broker Genius, Inc. v. Volpone*,
 313 F. Supp.3d 484 (S.D.N.Y. 2018)........................................................................23

*Cadbury Beverages, Inc. v. Cott Corp.*,
 73 F.3d 474 (2d Cir. 1996)........................................................................................24

*Church of Scientology Int'l v. Elmira Mission of Church of Scientology*,
 794 F.2d 38 (2d Cir. 1986)...................................................................................26, 28

*CJ Products v. Snuggly Plushez LLC*,
 809 F. Supp. 2d 127 (E.D.N.Y. 2011) ......................................................................26

*Cmty. for Creative Non-Violence v. Reid*,
 490 U.S. 730 (1989)...................................................................................................20

*Coach, Inc. v. Horizon Trading USA Inc.*,
 908 F. Supp. 2d 426 (S.D.N.Y. 2012).......................................................................24

*eBay Inc. v. MercExchange, LLC*,
 547 U.S. 388 (2006)...................................................................................................28

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
 286 F. Supp. 2d 284 (S.D.N.Y. 2003).......................................................................26

*Kwan v. Schlein*,
 634 F.3d 224 (2d Cir. 2011).......................................................................................27

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
 192 F.3d 337 (2d Cir. 1999).......................................................................................24

*Liebowitz v. Elsevier Sci. Ltd.*,
 927 F. Supp. 688 (S.D.N.Y. 1996) ...........................................................................18

*Marks Org., Inc. v. Joles*,
 784 F. Supp. 2d 322 (S.D.N.Y. 2011).......................................................................28

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
 Contemporary Dance, Inc.*,
 43 Fed. App'x 408 (2d Cir. 2002)..............................................................................23

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)..................................................................................14, 29

*NYP Holdings v. New York Post Pub. Inc.*,
  63 F. Supp. 3d 328 (S.D.N.Y. 2014).............................................................................30

*Philip Morris USA Inc. v. Felizardo*,
  No. 03-cv-05891, 2004 WL 1375277 (S.D.N.Y. June 18, 2004) ............................25

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)............................................................................................15

*Tecnimed SRL v. Kidz-Med, Inc.*,
  763 F. Supp. 2d 395 (S.D.N.Y. 2011), *aff'd*, 462 Fed. App'x 31 (2d Cir. 2012) ..................15

*Tomas v. Gillespie*,
  385 F. Supp. 2d 240 (S.D.N.Y. 2005)..........................................................................28

*Topps Co. v. Gerrit J. Verburg Co.*,
  No. 96-cv-07302, 1996 WL 719381 (S.D.N.Y. Dec. 13, 1996) ............................26

*Tuccillo v. Geisha NYC, LLC*,
  635 F. Supp. 2d 227 (E.D.N.Y. 2009) .........................................................................19

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011)..........................................................................28

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)........................................................................................................14

**Statutes**

15 U.S.C. § 1057(b) ...............................................................................................................16

15 U.S.C. § 1063 ....................................................................................................................16

15 U.S.C. § 1114(1)(a) ..........................................................................................................24

15 U.S.C. § 1116(d)(1)(A) and (B)......................................................................................24

15 U.S.C. § 1115(a) .........................................................................................................17, 27

15 U.S.C. § 1127.....................................................................................................................16

17 U.S.C. § 507(b) ..................................................................................................................27

**Other Authorities**

3 *McCarthy on Trademarks and Unfair Competition* § 18:4 (5th ed.)..........................................23

Restatement Third, Unfair Competition § 35, comment............................................................27, 28

9C Wright & Miller, *Federal Practice and Procedure* § 2586 (3d ed.).......................................19

I.    **INTRODUCTION**

Encyclopaedia Iranica Foundation, Inc. ("EIF") submits this post-hearing brief summarizing relevant facts and case law in support of its motion for a preliminary injunction prohibiting Defendants from using counterfeit imitations of EIF's registered ENCYCLOPÆDIA IRANICA mark in connection with the advertising and sale of printed and online publications, while this litigation is pending. As set forth in the Court's Order, this brief includes a statement of facts ("SOF") citing to the transcript of the evidentiary hearings and exhibits and a section applying the law to the relevant facts of the case. *See* ECF No. 129.

II.    **STATEMENT OF FACTS**

    A.    **EIF obtained rights in the ENCYCLOPÆDIA IRANICA mark through use and as the successor-in-interest to Dr. Yarshater.**

        (1)    **Dr. Yarshater was the creator and original owner of the mark.**

1.    Dr. Yarshater "founded the Encyclopaedia Iranica in 1973 and remained its Editor-in-Chief until his retirement" from the position in 2017. Ex. 2.8 at 1; *see* Tr. 70:17-24.

2.    Dr. Yarshater personally and individually contracted with Routledge & Kegan Paul Limited to publish the first fascicles and volumes of the *Encyclopaedia Iranica* in an agreement signed on September 24, 1981. *See* Ex. HHH, 13; Tr. at 38:13-18, 39:21-40:8. This publishing agreement states that Dr. Yarshater, as Editor, "undertakes to *invite contributions* to the work from authors and *will supervise their preparation and quality*." Ex. HHH at 1, ¶ 1(a) (emphases added). Dr. Yarshater "shall ensure that each contributor will assign copyright in his contribution to the work to [Dr. Yarshater]." Ex. HHH at 1, ¶ 1(c).

3.    The Routledge agreement was signed by Dr. Yarshater as "Editor" and does not list Columbia as a party. Ex. HHH at 4; Tr. at 42:23-43:7. There is no evidence that Dr. Yarshater ever signed or had authority to sign contracts on Columbia's behalf. *See* Tr. at 43:8-18. Because Dr. Yarshater personally

hired Routledge to print and distribute the *Encyclopaedia Iranica*, he himself was the first person to use ENCYCLOPÆDIA IRANICA as a trademark by placing it on the product and selling and having the marked product published and distributed in commerce. *See* Ex. HHH.

4.      Volume I of the *Encyclopaedia Iranica*, consisting of 9 fascicles, was edited by Dr. Yarshater and published by Routledge in 1985. *See* Ex. 13; Tr. at 39:21-40:8. Volume I includes the ENCYCLOPÆDIA IRANICA mark and lists Dr. Yarshater as the editor and copyright owner and does ***not*** mention Columbia or the Center for Iranian Studies address. *See* Ex. 13. Columbia admits that none of its employees worked at the Center for Iranian Studies before 1990. *See* Ex. KK (Vahid Noshirvani first employee of the Center in 1990). Dr. Yarshater published Volume 1, Fascicle 1 in 1982 – eight years before any Columbia employee worked at the Center for Iranian Studies. *See* Exs. S, KK.

5.      The phrase "Center for Iranian Studies, Columbia University, New York" on the cover of fascicles of the *Encyclopaedia Iranica* merely denoted the address at which Dr. Yarshater could be contacted, and does not identify a legal entity. *See* Tr. at 42:6-16. There is no evidence that anyone other than Dr. Yarshater was in control of the *Encyclopaedia Iranica* in 1982 when he first placed the mark on Volume I, Fascicle 1 and sold it. *See* Ex. KK.

**(2)      Dr. Yarshater controlled the production, content, and quality of the marked products as Editor-in-Chief of the *Encyclopaedia Iranica*.**

6.      Dr. Yarshater identified himself as the editor immediately below the trademark ENCYCLOPÆDIA IRANICA on the cover of every volume and fascicle of the *Encyclopaedia Iranica*, from Vol. I, Fas.1 through Vol. XVI, Fas. 3. Tr. at 31:1-6; Exs. 13–27, S.

7.      As Editor-in-Chief, Dr. Yarshater was the author and controlled the content of the *Encyclopaedia Iranica*. Tr. at 31:10-17. He decided which articles were included and how they were arranged. *See* Tr. at 188:8-10. He was responsible for selecting authors and personally edited or

oversaw the editorial review and acceptance of articles. *See* Tr. at 52:7-19. He also established guidelines and standards for authors. *See* Tr. at 52:20-24; Ex. 2.16.

8.      After termination of the Routledge agreement, Dr. Yarshater continued publishing the *Encyclopaedia Iranica* using Mazda Publishers and Bibliotheca Persica Press to print Volume V, Fascicle 1, through Volume XI, Fascicle 6. *See* Exs. 17-22, S. Dr. Yarshater, as Editor-in-Chief and EIF's President, directed all of the printers to affix the ENCYCLOPÆDIA IRANICA trademark on each of the volumes and fascicles. *See* Tr. at 37:4-24. There is no evidence that Columbia contracted or had any involvement in printing or paid for the printing of any of these volumes or fascicles, nor was it identified as the source of these marked products.

9.      Dr. Yarshater, as EIF's President, later contracted with Eisenbrauns, Inc., in the late 1990s for pre-press work, and for the printing, binding, and distribution of the *Encyclopaedia Iranica*. *See* Tr. at 149:17-150:2, 151:20-153:12, 37:4-24; Ex. 10 at § 17 ("beginning on October 1, 1998"). This contract was between Eisenbrauns and EIF and identifies EIF as the "Publisher" and Eisenbrauns as the "Distributor." *See* Tr. at 149:17-150:2; Ex. 10 at 1. Eisenbrauns had the "exclusive right to distribute in all markets worldwide any and all fascicles and volumes of the [*Encyclopaedia Iranica*] offered by [EIF] to [Eisenbrauns]." Ex. 10 at 1 § 1; *see also* Tr. at 153:14-154:1.

10.     Dr. Yarshater directed Eisenbrauns to affix the ENCYCOPAEDIA IRANICA mark on the printed *Encyclopaedia Iranica* volumes and fascicles that Eisenbrauns manufactured and distributed pursuant to its contracts with EIF (i.e., Volumes XI–XV and fascicles 1–3 of Volume XVI). *See* Exs. 23–30; Tr. at 37:14-21, 156:19-157:4. He also provided direction regarding the typeset to use for the ENCYCOPAEDIA IRANICA mark and what content to include on the cover of these printed volumes and fascicles. *See* Tr. at 156:19-23.

11.     Dr. Yarshater (as EIF's President) and Dr. Ashraf (as EIF's Executive Director) renewed this

contract with Eisenbrauns in 2013. *See* Ex. 10; Tr. at 150:6-21. Volumes XI–XV and Fascicles 1–3 of Volume XVI were published pursuant to this contract and the ENCYCLOPÆDIA IRANICA mark was affixed to these works at Dr. Yarshater's direction and control in his capacity as EIF's President. *See* Exs. 10, 23–30; Tr. at 150:6-21, 157:23-159:14.

12.     At Dr. Yarshater's direction, Eisenbrauns filed copyright applications on EIF's behalf for the *Encyclopaedia Iranica* fascicles and volumes that it distributed pursuant to its contracts with EIF. *See* Tr. at 160:17-22; Ex. 1 at ¶ 14; Ex. 1.4. Eisenbrauns commonly filed copyright applications for publications that it handled for societies and organizations, which held contracts similar in scope to Eisenbrauns' contracts with EIF. *See* Tr. at 160:17-22. Columbia never challenged EIF's copyright registrations. *See* Tr. at 159:4-10.

13.     As Editor-in-Chief, Dr. Yarshater directed the work of various individuals who assisted with the preparation of articles for inclusion in the *Encyclopaedia Iranica*, including assistant and senior editors who reported to him. Tr. at 31:18-24. As Editor-in-Chief, Dr. Yarshater also oversaw the content used in the online version of the *Encyclopaedia Iranica* on EIF's website, which was originally hosted at www.iranica.com and later migrated to www.iranicaonline.org. *See* Ex. 2.5, 2.9; Tr. at 49:6, 52:6-24. Dr. Yarshater was also assisted by Dr. Brunner, an EIF employee, responsible for the digital platform used to manage the online version of the *Encyclopaedia Iranica*. *See* Tr. at 49:16-25.

14.     There is no evidence that Dr. Yarshater ever asked Columbia for permission or approval for any of the work he did on the *Encyclopaedia Iranica*, nor is there any evidence of him providing a report on his work to Columbia. *See* Tr. at 167:23-168:4. There is also no evidence that Dr. Yarshater ever received instructions from Columbia regarding the content or management of the *Encyclopaedia Iranica*, nor is there any evidence that anyone at Columbia exercised decision-making authority over Dr. Yarshater's work on the *Encyclopaedia Iranica*. *See* Tr. at 168:5-13.

> **(3)**    **Dr. Yarshater was not paid by Columbia for his work as the Editor-in-Chief of the *Encyclopaedia Iranica* nor as the Director of the Center for Iranian Studies.**

15.     Dr. Yarshater was independently wealthy and did not need a salary to support himself. *See* Tr. at 55:2-5, 167:1-5, 166:8-10. For example, he owned a Rodin sculpture, which he auctioned at Christie's for over $5.6 million to raise funds for the *Encyclopaedia Iranica*. *See* Tr. at 177:1-5. He and his wife sold their collection of rare books for $1.4 million and donated these funds to EIF. *See* Tr. at 178:5-17.

16.     Dr. Yarshater never received compensation from Columbia for his work on the *Encyclopaedia Iranica* as Director of the Center for Iranian Studies or for publishing the *Encyclopaedia Iranica*. *See* Ex. JJ at 3; ECF No. 99 at ¶ 4; Tr. at 223:2-13.

17.     Dr. Yarshater's work on the *Encyclopaedia Iranica* was never within the scope of his employment as a professor by Columbia. Ex. 35 ¶ 7; Tr. at 192:21-24. He was hired by Columbia as a Visiting Associate Professor from 1958–60, and later as the Kevorkian Professor of Iranian Studies from 1960 to 1990. *See* Ex. JJ. He retired as a tenured professor in 1990. Ex. JJ.  He worked intermittently as a part-time Special Lecturer from 1991–94, 1997–98, and 2000–02, for which he received a small salary. *See* Ex. JJ. Dr. Edsall speculated that Dr. Yarshater was subject to an employment agreement with Columbia for his position as a full-time professor, and that he would likely have received an offer letter setting forth his duties as a Special Lecturer, although she did not know whether he actually received one. *See* Tr. at 220:3-14. Columbia produced no employment agreement or offer letter regarding Columbia's employment of Dr. Yarshater.

18.     Dr. Edsall claims that she directed Dr. Yarshater "[t]o hire, appoint, review, manage researchers in the center who were working on the Encyc[l]opaedia and other research projects." Tr. at 225:10-12. But she admitted that there are no documents corroborating that "[she] or Columbia [had] directed Dr. Yarshater to carry out any tasks as director of the center." Tr. at 226:2-3, 7.

> **(4)**   **Dr. Yarshater created EIF to oversee and publish the *Encyclopaedia Iranica* and to hold all trademarks and copyrights for this work.**

19.     The "Encyclopaedia Iranica Foundation was formed by Dr. Yarshater in 1990 to, first of all, carry its mission, which was to ensure the uninterrupted and permanent continuation of the encyclopaedia, and also to secure its intellectual independence and financial longevity." Tr. at 174:19-23; Ex. 2.8 at 1. Through his actions and through written documents such as EIF's certificate of incorporation and by-laws, Dr. Yarshater demonstrated his intent to have EIF and its Board of Directors oversee the publication and completion of his life's work, the *Encyclopaedia Iranica*. In connection with this mission, "one of the things that [Dr. Yarshater] did was to transfer all of his intellectual property to Encyclopaedia Iranica, to the foundation." Tr. at 174:23-25; Ex. 5 at 1 (Section 1.1(C)).

20.     EIF's Certificate of Incorporation, dated June 19, 1990, was signed by Dr. Yarshater as the founding President of EIF. *See* Ex. 4 at 2, 6. It states that EIF was formed:

> To conduct and carry out research on all aspects (including, without limitation, cultural, historical, literary, economic, political, educational, social, demographic and ethical) of Iranian and related studies, either alone or in combination with another or other organizations. To promote the cause of the *Encyclopaedia Iranica* and assure the continuation thereof. To establish an endowment fund for the *Encyclopaedia Iranica*. **To publish, disseminate and distribute, and help others to publish, disseminate, and distribute the results of such research**.

Ex. 4 at 1-2 (emphasis added); Tr. at 33:11-23. "[EIF's] charter empowers it to carry out the [*Encyclopaedia Iranica*] project independently, if necessary . . . ." Ex. C at 8.

21.     As its founder and President, Dr. Yarshater used EIF to carry out the business of publishing the *Encyclopaedia Iranica,* including the signing of contracts and approval and payment of expenses for the *Encyclopaedia Iranica*. *See* Tr. at 168:15-19. EIF incurred all of these expenses, including salaries for employees who worked on the *Encyclopaedia Iranica*, honoraria for authors, office equipment, and the "operating budget of the *Encyclopaedia Iranica*," for which Columbia has never reimbursed EIF. *See* Tr. at 178:23-179:8.

22.     Dr. Yarshater remained a member of EIF's Board of Directors until 2018, a few months before he passed away. *See* Tr. at 167:9-12.

23.     As shown by EIF's by-laws, in effect years prior to the present dispute, "[t]he absolute and unqualified ownership of all aspects of the intellectual property of the *Encyclopaedia Iranica*, including copyright, trademark, reproduction rights electronically or mechanically of the *Encyclopaedia Iranica*, shall be vested in the Foundation." Ex. 5 at 1, ¶ 1.1(C); *see also* Tr. at 35:13-36:6. Furthermore, "[EIF] will be solely responsible to select, at its own discretion, the institutional base of the *Encyclopaedia Iranica*." Ex. 5 at 1¶ 1.1(D); *see also* Tr. at 36:7-19. Mr. Ahari, EIF's former counsel and Dr. Yarshater's personal attorney, drafted the by-laws based on Dr. Yarshater's input and testified that Dr. Yarshater "100 percent agreed with" these statements. Tr. at 120:19-121:3. In addition, the by-laws state that the "Board of Directors, as the ultimate responsible body for the Foundation . . .  shall be the custodian of the Foundation's assets, including its intellectual property." Ex. 5 at 6.

24.     On October 5, 2013, EIF's Board held its meeting at Columbia's Faculty House to discuss issues relevant to the *Encyclopaedia Iranica*. *See* Ex. 7. Dr. Yarshater was present as EIF's President and as an *ex officio* member of the Board. *See* Ex. 7 at 1; Tr. at 117:10-11. Dr. Ashraf was also present as EIF's Executive Director and as an *ex officio* member of the Board. *See* Ex. 7 at 1; Tr. at 117:12-13. At this meeting, Dr. Ashraf reported on negotiations with Columbia regarding the *Encyclopaedia Iranica*, and summarized the Board's position as follows:

> The most difficult issue in the negotiation with Columbia University, which has yet to be explored, is the ownership of the intellectual property of the Project. However ***the Foundation believes it has legitimate rights to the intellectual property of the Project***, but in order not to be objectionable, it should consider a variety of middle road approaches to the matter. One such approach, which Directors seemed open to, is for ***the Foundation to maintain full ownership rights to the intellectual property***, subject to an irrevocable royalty-free license for the University to use the work for its own non-commercial purposes.

Ex. 7 at 6 (emphases added); *see also* Tr. at 117:19-118:23. Mr. Ahari confirmed that the minutes for this meeting were endorsed by Dr. Yarshater and reflect the Board's understanding regarding this issue. Tr. at 118:4-23. Mr. Ahari also stated that "the Project" in these meeting minutes referred to the *Encyclopaedia Iranica*. Tr. at 118:22-23.

25.     On December 13, 2014, EIF's Board met at Dr. Yarshater's home at 450 Riverside Drive to discuss issues relevant to the *Encyclopaedia Iranica*. *See* Ex. 8. Dr. Yarshater was present at this meeting. *See* Ex. 8 at 1; Tr. at 122:8-23. The minutes indicate that "relations with Columbia University" were discussed:

> There has been no progress on the issue of copyright although it was expected that ***the Foundation, as the owner of the intellectual property***, would grant Columbia University an irrevocable license to use the copyright without remuneration.

Ex. 8 at 6 (emphasis added). Mr. Ahari confirmed that this statement was supported and endorsed by Dr. Yarshater. *See* Tr. at 123:6-16.

> **(5)     EIF contracted with third parties for the online version of the *Encyclopaedia Iranica* and for the content management thereof.**

26.     EIF currently owns and operates the website at [www.iranicaonline.org](www.iranicaonline.org), which has been the primary online address of the *Encyclopaedia Iranica* since at least 2010. *See* Tr. at 169:7-10, 170:8-9. EIF has created and controlled the content published in the online version of the *Encyclopaedia Iranica* since at least September 17, 2009, when EIF entered into an agreement with Electric Pulp, Inc., to redesign and maintain the *Encyclopaedia Iranica* website. *See* Ex. 9; Tr. at 171:9-173:6. This agreement identified the "client" party as "Encyclopaedia Iranica." Ex. 9 at 1. Dr. Yarshater signed the agreement as "President" of the "client" party. Ex. 9 at 4. Dr. Yarshater was never President of Columbia. *See* Tr. 172:18-19. However, he was EIF's President when the agreement was signed. *See* Ex. 2.8 at 1.

27.     EIF's online version of the *Encyclopaedia Iranica* has always provided free access to

thousands of articles contained in the *Encyclopaedia Iranica*. *See* Tr. at 169:7-13, 170:8-9. Dr. Yarshater established this free access policy because he "believed that the Iranian civilization and its contribution to the civilized world in the West has been undermined and overlooked, and he felt very strongly that it needed to be given an accurate history." Tr. at 169:22-25.

28.     In 2017, EIF contracted with Clarivate Analytics (US) LLC to use its ScholarOne software platform, so that EIF could store and organize author correspondence and release agreements as well as planned and published articles. *See* Ex. 11; Tr. at 184:8-15. After EIF purchased a license to use this software, it created a database of articles in various stages of progress that had been worked on by assistant editors under Dr. Yarshater's supervision. The articles were imported into the ScholarOne database. *See* Tr. at 184:10-15 and 188:2-5.

29.     EIF is expressly identified as the "CLIENT" in this contract. Ex. 11 at 1. Dr. Daniel signed this contract on behalf of EIF. Ex. 11 at 3. The ScholarOne database included unpublished articles that were in the pipeline for many years. *See* Tr. at 184:24-185:3. EIF paid at least $12,000 for the first two years of the ScholarOne license. *See* Tr. at 185:16-22. Without EIF's authorization, Columbia misappropriated the ScholarOne database from EIF. *See* Tr. 185:4-6.

### (6)     EIF maintained control over the *Encyclopaedia Iranica* and ownership of related intellectual property after Dr. Yarshater retired.

30.     Dr. Yarshater stepped down as Editor-in-Chief in 2017. *See* Tr. at 301:5-10; 70:17-24. Dr. Daniel was hired as interim Editor-in-Chief until a permanent replacement could be found. *See* Tr. at 179:14-181:16. EIF negotiated the terms of his contract with Dr. Daniel and allocated EIF funds to cover his salary and benefits, payment of which was outsourced to Columbia along with that of others who assisted Dr. Yarshater. *See* Tr. at 181:13-16, 182:7-10. EIF informed Dr. Daniel that he would be reporting to EIF in this role as interim editor, which formally started on January 15, 2017. *See* Tr. at

181:10-12; Ex. O at 1 ("appointment . . . beginning January 15, 2017"), 2 (accepted on "1/9/2017").[1]

31.     In an email to EIF's Board dated December 5, 2017, Dr. Daniel, who was the interim Editor-in-Chief and Director of the Center for Iranian Studies at the time, stated:

> The distribution agreement with Eisenbrauns was made in 2013 by Professor Yarshater as President and CEO of the Encyclopaedia Iranica Foundation and co-signed by Ahmad Ashraf as Executive Director. *So far as I can tell, Professor Yarshater still holds his office and remains the only individual with the authority to take unilateral action on this matter*.

Ex. 201 at 2 (emphasis added).

32.     This email shows that Dr. Daniel consulted with EIF's Board and requested instructions regarding how to address the closure of Eisenbrauns, and that absent instructions from Dr. Yarshater, "it becomes the problem of the Board [of EIF]," and he "will require instructions and authorization from the full board if it wants me to act on its behalf in any way." Ex. 201 at 2.

33.     Dr. Daniel's email concedes that Eisenbrauns' inventory included copies of "five volumes [XI-XV] and three fascicles [Vol. XVI, Fas. 1-3]" that were "published by EIF." Ex. 201 at 2; *see* Exs. 13–27.

### (7)     EIF owns a federal trademark registration for the ENCYCLOPÆDIA IRANICA mark.

34.     On July 20, 2018, EIF applied to register its ENCYCLOPÆDIA IRANICA mark with the U.S. Patent and Trademark Office ("USPTO") and on October 8, 2019, the USPTO issued Reg. No. 5,877,427 for the following goods and services: (1) "[p]rinted publications, namely, books, articles, book reviews and encyclopedias . . ." (with a first use date of at least December 17, 2003); and (2) "[p]roviding an online research tool in the nature of an online search platform . . ." (with a first use date of at least 2009). *See* Ex. 1.1 at 1. EIF continues to use this ENCYCLOPAEDIA IRANICA mark as recent as its July 2020 publication of Volume XVI (inclusive of Fascicles 1-3) of the

---

[1] The "January 6, 2016" date at the top of the letter is a typographical error regarding the year.

*Encyclopaedia Iranica. See* Ex. 2.15.

> **(8)     Columbia never affixed the ENCYCLOPÆDIA IRANICA mark on any publications nor has it ever published or distributed the *Encyclopaedia Iranica* prior to the present dispute.**

35.     EIF's relationship with Columbia was cordial and cooperative until early 2018, when Columbia demanded a substantial contribution of $ 5.5 million from EIF; EIF declined to make this contribution. *See* Ex. 34 at ¶ 14. Columbia responded by barring EIF from its offices at 450 Riverside Drive and refusing to return EIF's property, precipitating the present dispute and subsequent litigation. *See* Ex. 34 at ¶¶ 15-17. Prior to this dispute, Columbia never affixed the ENCYCLOPÆDIA IRANICA mark on any publications nor did it contract with any individuals or entities who would affix this mark to publications or products. *See* Tr. at 38:2-9. Similarly, Columbia did not previously sell publications or maintain websites using the trademark ENCYLOPÆDIA IRANCIA. *See* Tr. at 55:10-19.

36.     According to Mr. Eisenbraun, who has four decades of experience in the academic publishing industry, Dr. Yarshater's use of a Columbia address on the *Encyclopaedia Iranica* volumes and fascicles is an indication of a physical location, ***not*** ownership or control by Columbia. *See* Tr. at 147:22-148:1, 157:5-12. By contrast, the placement of "Encyclopaedia Iranica Foundation" at the bottom of the cover, inside pages and back page is an indication of ownership and control by EIF. *See* Tr. at 157:5-17.

37.     Eisenbrauns was the exclusive distributor of the *Encyclopaedia Iranica* from 2003–17 and Mr. Eisenbraun testified that he never received any communications from Columbia regarding the fact that EIF was listed as the publisher and copyright owner. *See* Tr. at 158:25-159:10.

> **(9)     Defendants' recent marketing of competing products bearing the ENCYCLOPÆDIA IRANICA mark has caused actual confusion.**

38.     Although Daniel's salary was paid by EIF, Columbia enlisted him to negotiate an unauthorized contract with Brill to publish unauthorized fascicles of the *Encyclopaedia Iranica* under Columbia's

name. *See* Ex. 12.  EIF's Counsel notified Brill that it had no right to publish any such work, but Brill continued to do so anyway, resulting in the present litigation. *See* Ex. 32. Without EIF's authorization, Defendants began publishing and marketing their first counterfeit work (Volume XVI, Fascicle 4) bearing a counterfeit imitation of EIF's registered ENCYCLOPÆDIA IRANICA trademark in December 2018. *See* Ex. 32 at 5; Ex. S at 309-311.

39.    Defendants used an exact copy of EIF's trade dress and the ENCYCLOPÆDIA IRANICA trademark and typeface of the mark used on EIF's products. *See* ECF No. 91-1 at 21 (copied below).



| EIF's Vol. XVI, Fas. 3 (front cover) | Defendants' Counterfeit Vol. XVI, Fas. 4 (front cover, with yellow highlighting) |

40.    Columbia ***twice admitted*** that its competing encyclopedia has "caused confusion among contributors and other scholars in the field," and has "caused confusion and delay." Ex. 2.19.

41.    The unauthorized and counterfeit version of the *Encyclopaedia Iranica* has resulted in confusion among authors and donors. *See* Tr. at 63:14-64:5. Authors have contacted EIF due to confusion stemming from publication of counterfeit Fascicles 4 and 5 of Volume XVI bearing EIF's ENCYCLOPÆDIA IRANICA mark. *See* Tr. at 63:16-23. Donors have become reluctant to donate to EIF based upon Defendants' conduct and claims regarding ownership of the *Encyclopaedia Iranica* trademark and copyright rights. *See* Tr. at 64:6-21. As a not-for-profit public charity, EIF relies heavily

upon the goodwill and reputation that it has built over the decades with the ENCYCLOPÆDIA IRANICA mark to raise donations to carry out its mission to publish and maintain the *Encyclopaedia Iranica*. *See* Ex. 34 at ¶¶ 10, 17; Tr. at 63:14-64:21. EIF relies on donations because the *Encyclopaedia Iranica* is a scholarly work with essentially no commercial value. *See* Tr. at 131:4-7. EIF will likely be forced to cease operations as a non-profit public charity, if this harm continues. *See* Ex. 34 at ¶ 10.

## B.   EIF owns indisputable federal copyright registrations for Volumes XI–XVI.

### (1)   Dr. Yarshater selected and arranged the articles included in each volume of the *Encyclopaedia Iranica* while Editor-in-Chief of the work.

42.   Dr. Yarshater's contract with Routledge to publish the first volume of the *Encyclopaedia Iranica* states that he, as Editor, "undertakes to invite contributions to the work from authors and will supervise their preparation and quality." Ex. HHH at 1, ¶ 1(a).

43.   Dr. Yarshater is listed as the sole copyright owner in the copyright notices in Volumes I–X, which were published between 1985 (Volume I) and 2001 (Volume X) and fascicles between 1982 (Volume I, Fascicle 1) and 1998 (Volume VIII, Fascicle 3). *See* Exs. 13–22, S.

44.   As Editor-in-Chief, Dr. Yarshater determined which articles were included in the *Encyclopaedia Iranica* and how they were arranged. *See* Tr. at 188:8-10. He was responsible for selecting authors and oversaw the editorial review and acceptance of articles. *See* Tr. at 52:7-19.

45.   Columbia is not listed in any copyright notice of any volume or fascicle of the *Encyclopaedia Iranica* prior to the publication of counterfeit Volume XVI, Fascicle 4. *See* Exs. 13–30; Ex. S; Tr. at 45:10-15.

### (2)   Dr. Yarshater directed the filing of federal copyright applications for the *Encyclopaedia Iranica*.

46.   All of the copyright registrations for authorized volumes and fascicles of the *Encyclopaedia Iranica* issued by the U.S. Copyright Office since at least Volume XI, Fascicle 6 (published on August 30, 2003) list EIF as the claimant. *See* Tr. at 47:9-48:2; Ex. 1 at ¶ 14; Ex. 1.4.

47.     EIF is identified as the copyright owner in the copyright notices in each volume of the *Encyclopaedia Iranica* published between 2003 and the start of the present dispute (i.e., Volumes XI–XV). *See* Tr. at 157:18-158:24. EIF is listed as the copyright owner in the copyright notice on the back cover of every fascicle of the *Encyclopaedia Iranica* during this time. *See* Ex. S.

48.     Dr. Yarshater had an established policy for authors to transfer rights for their articles to EIF using a release form. *See* Tr. at 57:16-21. In February 2018, Dr. Daniel informed EIF that he and Columbia replaced Dr. Yarshater's approved form with a new one that conveyed rights to Columbia instead. *See* Tr. at 57:21-24.

## III.     **APPLICABLE LAW**

### A.     **A preliminary injunction will preserve the *status quo ante*.**

"The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties, until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Second Circuit has repeatedly explained that, for purposes of granting a preliminary injunction, the "*status quo*" is not simply the *status quo* in the moment before relief is granted. Rather, it refers to "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citations omitted).

Prior to this dispute, EIF was the only source of printed and online publications bearing the mark ENCYCLOPÆDIA IRANICA and it controlled the content of both including the only online version of the *Encyclopaedia Iranica* at www.iranicaonline.org. SOF 9-11, 26. It was EIF that contracted with Eisenbrauns to publish and distribute the *Encyclopaedia Iranica* since at least 1998. SOF 9. Eisenbrauns operated as the exclusive worldwide distributor of the *Encyclopaedia Iranica*, and distributed Volumes XI–XV (along with numerous fascicles through fascicles 1–3 of Volume XVI) on EIF's behalf. SOF 9. EIF's registered trademark has always been displayed on each of these publications. SOF 9. Furthermore, EIF is listed as the publisher and copyright owner in each of these

14

volumes. SOF 9, 37. As the owner of copyright registrations for the five most recent volumes of the *Encyclopaedia Iranica*, EIF is the only entity authorized to publish these works. EIF's most recent publication prior to the start of the present dispute was Volume XVI, Fascicle 3, published in 2017.

This motion seeks to restore the *status quo ante*, when EIF was the sole publisher of the print version of the *Encyclopaedia Iranica* and in control of the website that hosted the online version of the *Encyclopaedia Iranica*. Absent this relief, EIF will suffer irreparable harm. Defendants' conduct has already created actual confusion—by Columbia's own admission (SOF 38, 40)—and Defendants' further encroachment and expansion are likely to cause more irreparable damage to EIF's reputation and the goodwill associated with EIF's ENCYCLOPÆDIA IRANICA mark.

### B.    EIF has satisfied the elements required for a preliminary injunction.

In the Second Circuit, a party seeking a preliminary injunction must demonstrate: (1) "a likelihood of success on the merits or [] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (citations and internal alterations and quotation marks omitted); *see also Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 402 (S.D.N.Y. 2011), *aff'd*, 462 Fed. App'x 31 (2d Cir. 2012) (granting preliminary injunction in trade dress case and finding that manufacturer demonstrated a likelihood of success over the distributor's ownership challenge claim).

EIF has established all four of these elements and the evidence from the recent evidentiary hearing further supports the conclusion that EIF is entitled to injunctive relief.

(1)    **EIF is likely to win on the merits or, at least, has raised serious questions going to the merits to make them a fair ground for litigation.**

(a)    **EIF is the owner of the ENCYCLOPÆDIA IRANICA mark.**

Trademark rights are obtained under the common law by the first person that uses a mark in connection with an established trade or business. In this context, "use" is defined as follows: "a mark shall be deemed to be in use in commerce – (1) on goods when – (A) it is placed in any manner on the goods . . . and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127.

Dr. Yarshater placed the ENCYCLOPÆDIA IRANCA mark on the *Encyclopaedia Iranica,* first in his personal capacity as the Editor-in-Chief and later as EIF's President, and sold and transported the marked goods in commerce. Columbia did not. EIF has therefore met the requirements of trademark ownership and Columbia has not.

EIF owns federal registrations for the marks ENCYCLOPÆDIA IRANICA and ENCYCLOPÆDIA IRANICA FOUNDATION. SOF 34. The federal registrations provide "prima facie evidence of the validity of the registered marks of [EIF's] ownership of the marks, and of its exclusive right to use the marks in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b). Columbia has failed to rebut the presumption of ownership created by any of EIF's registrations. EIF's federal registration for the mark ENCYCLOPÆDIA IRANICA was filed on July 20, 2018, ***more than one year*** prior to the present litigation. It was published for a 30-day opposition period pursuant to 15 U.S.C. § 1063, but none of the Defendants sought to oppose it. *See* Ex. 1 at ¶ 9. Columbia's later decision to petition for cancellation has not proceeded beyond the petition stage and does nothing to change the fact that EIF's mark was registered on the Principal Register of the U.S. Patent and Trademark Office along with the well-established

16

presumption of validity that comes with a federal registration of a mark. *See* 15 U.S.C. § 1115(a).[2]

Furthermore, EIF's registration of the ENCYCLOPÆDIA IRANICA mark provides formal recognition of its longstanding common law rights in this mark. Dr. Yarshater first used the mark ENCYCLOPAEDIA IRANICA at least as early as 1982, when he published Vol. 1, Fas. 1 of the *Encyclopaedia Iranica*. SOF 2-4. The initial publishing contract with Routledge in 1981 confirms that he was required to "undertake[] to *invite contributions* to the work from authors and *will supervise their preparation and quality*" as the "Editor" of the work. SOF 2. Columbia was not a party to the contract, nor is there any evidence showing that Dr. Yarshater ever had authority to sign contracts on Columbia's behalf. SOF 2. Further confirming Dr. Yarshater's primary control is the identification of him as the Editor on the cover of every volume and fascicle of the *Encyclopaedia Iranica*.[3] SOF 6. As the Editor-in-Chief of all fifteen volumes and fascicles published from 1985 to 2017, Dr. Yarshater controlled the contents of the *Encyclopaedia Iranica*. SOF 7. He had final determination on which articles were included and how they were arranged. SOF 7. He was also responsible for selecting authors and oversaw the editorial review and acceptance of articles. SOF 7.

Later, Dr. Yarshater contracted with Eisenbrauns in the late 1990s as EIF's President and renewed this agreement with Eisenbrauns in 2013 regarding the *Encyclopaedia Iranica*. SOF 9 and SOF 11. Volume XI through Volume XVI, Fascicle 3 of the *Encyclopaedia Iranica* were published pursuant to these agreements, and the ENCYCLOPÆDIA IRANICA mark was affixed to these works at Dr. Yarshater's direction, acting in his capacity as EIF's President. SOF 11. Throughout this time,

---

[2] "Any registration . . . of a mark registered on the principal register . . . owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration . . . ." 15 U.S.C. § 1115(a).
[3] Volume XV was the final volume published during Dr. Yarshater's lifetime.

Dr. Yarshater was also the Editor-in-Chief and directed the work of various individuals who assisted with the preparation of content for inclusion in the *Encyclopaedia Iranica*, including assistant and senior editors (including Dr. Daniel) who reported to him. SOF 13. Dr. Yarshater oversaw the content of the online version of the *Encyclopaedia Iranica* at [www.iranicaonline.org](www.iranicaonline.org), with assistance from Dr. Brunner, an EIF employee. SOF 13.

Dr. Yarshater was the executive decision-maker in charge of the print and online versions of the *Encyclopaedia Iranica* from its inception until his retirement in 2017. SOF 1, 2, 7, 13-14. In this role, Dr. Yarshater exercised absolute control over the contents and quality of the *Encyclopaedia Iranica*. SOF 2, 7, 13-14.

This Court has previously recognized that trademark rights related to a mark used on a publication vest in the editor. *See Liebowitz v. Elsevier Sci. Ltd.*, 927 F. Supp. 688 (S.D.N.Y. 1996). In *Liebowitz*, the editor-in-chief of two scientific journals sued the publisher seeking a declaration that he owned the trademarks associated with the journals. The case was about ownership of assets that the parties operated jointly for over 25 years. *Liebowitz* used a simple rule in deciding ownership: "whoever controls the quality of the goods marketed under the trademark is the source and therefore owns the trademark." *Id.* at 696. Columbia believes it stands in the shoes of *Liebowitz*'s editor-in-chief. It does not and the record does not support its narrative. Rather, it is indisputable that Dr. Yarshater was the driving force behind the *Encyclopaedia Iranica* for decades with final control over the quality of work. He solicited articles from authors and maintained quality control as Editor-in-Chief of the work. SOF 2, 7-14, 26. He also handled the business and logistical aspects of the work, as evidenced by the contracts that he signed with the publishers, distributors, and web developers used to market the *Encyclopaedia Iranica* in print and online. SOF at 2, 3, 9, 26.

There is no evidence that Dr. Yarshater ever asked Columbia for permission regarding the

work that he did on the *Encyclopaedia Iranica* or that he provided a report on his work to Columbia. SOF 14. Similarly, there is no *credible* evidence that Dr. Yarshater ever received instructions from Columbia regarding how he should handle management of the *Encyclopaedia Iranica*, or that anyone at Columbia exercised decision-making authority over his work on the *Encyclopaedia Iranica*. SOF 14, 18. During the evidentiary hearing, Dr. Edsall testified that she had directed Dr. Yarshater "[t]o hire, appoint, review, manage researchers in the center who were working on the Encyc[l]opaedia and other research projects." SOF 18. However, upon cross-examination, she admitted that no documents support that "[she] or Columbia [had] directed Dr. Yarshater to carry out any tasks as director of the center." SOF 18. Columbia provided over a thousand pages of exhibits in advance of the evidentiary hearing. Yet, this voluminous production did not include a single email, letter, or document supporting Dr. Edsall's claim. Courts in this Circuit have long recognized that self-serving testimony by a party witness which is not corroborated by documentary evidence should be given no weight. *See*, *e.g.*, *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 235 n.1 (E.D.N.Y. 2009) (granting preliminary injunction); 9C Wright & Miller, *Federal Practice and Procedure* § 2586 (3d ed.).

Dr. Yarshater's ability to maintain independent control over the *Encyclopaedia Iranica* is reasonable in view of his unique situation. Unlike most professors, Dr. Yarshater was wealthy and did not need a salary to sustain himself. SOF 15. Despite his wealth, Dr. Yarshater enjoyed a modest lifestyle and focused all of his time, energy and resources on his mission – the *Encyclopaedia Iranica*. Therefore, he did not rely on Columbia to fund his project and thereby owes nothing to Columbia.

Although Dr. Edsall testified that Dr. Yarshater had an employment agreement with Columbia for his position as a full-time professor, and would have received an offer letter setting forth his duties as a Special Lecturer, she admitted that she could only speculate as to whether he actually received one. SOF 17. Columbia has not produced either of these documents, nor has any other evidence been

provided to show that they exist. Moreover, even if Columbia were to produce these documents (if they exist), it would not change the fact that Dr. Yarshater was: (1) never paid to be the Director of the Center for Iranian Studies; and (2) that he retired in June 30, 1990. SOF 17. Columbia has no plausible claim to ownership of intellectual property produced by Dr. Yarshater, while he was retired. And during the period when Dr. Yarshater was employed by Columbia (as a professor), he was never paid to be the Director of the Center for Iranian Studies or to publish the *Encyclopaedia Iranica*. SOF 16. Columbia has not produced an employment agreement showing that Dr. Yarshater's position as a professor included duties related to management of the Center or work on the *Encyclopaedia Iranica*. SOF 17. Consequently, any voluntary work that he performed on or in connection with the *Encyclopaedia Iranica* was outside the scope of his employment as a professor. SOF 16-17.

Undeterred, Columbia suggests that it could simply "appoint" anyone with a title—regardless of whether they have retired—and then assert ownership of intellectual property created by that individual, without the need for compensation or a written instrument requiring the transfer of rights to Columbia. While an employer may have a claim to intellectual property produced by an individual under the work-for-hire doctrine, the individual must be employed and acting within the scope of his or her employment. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738, (1989). Columbia's attempt to extend this logic to Dr. Yarshater ignores the fact that he was never ***employed*** as Director of the Center and was not compensated for the work in question. As such, it is clear that Dr. Yarshater owned the intellectual property that he created as the Editor-in-Chief of the *Encyclopaedia Iranica*, and he remained free to transfer these rights at his sole discretion.

Columbia is further precluded from claiming copyright ownership in the *Encyclopaedia Iranica* since it was never its product. An entity such as Columbia can only acquire ownership of a copyrighted work by: (1) by having it created by an employee working within the scope of his or her

employment; (2) by entering into a written work for hire agreement; or (3) through an assignment from the copyright owner. Columbia has cited no authority for acquiring a copyrighted work created through forty years of work through a mere "policy," Columbia never introduced the policy as an exhibit and the policy is not in evidence. Further by Dr. Daniel's own admission, the policy became "effective on June 3, 2000"—a decade after Dr. Yarshater retired as a professor. ECF No. 81 at ¶ 11; *see* Ex. 17.

It is a fact that Dr. Yarshater chose to vest EIF with his intellectual property rights. As evidenced by the testimony of EIF Board member Ms. Nelson, the "Encyclopaedia Iranica Foundation was formed by Dr. Yarshater in 1990 to, first of all, carry out its mission, which was to ensure the uninterrupted and permanent continuation of the encyclopaedia, and also to secure its intellectual independence and financial longevity." SOF 19. This testimony is confirmed by other witnesses and by documentary evidence. For example, EIF's Certificate of Incorporation tasked EIF with several duties, including the obligation"[t]o promote the cause of the *Encyclopaedia Iranica* and ***assure the continuation*** thereof." SOF 20 (emphasis added). Dr. Yarshater further intended for EIF to be able to publish the *Encyclopaedia Iranica* on its own or with another university, as evidenced by EIF's 2008 Annual Report authored by Dr. Yarshater, which expressly stated that "[EIF's] charter empowers it to carry out the [*Encyclopaedia Iranica*] project independently, if necessary." SOF 20.

As President of EIF, Dr. Yarshater signed contracts on EIF's behalf and approved of expenses for the *Encyclopaedia Iranica*. SOF 21. Moreover, EIF incurred various expenses in connection with the publication and dissemination of the *Encyclopaedia Iranica* for which Columbia has never reimbursed EIF. SOF 21. As such, Dr. Yarshater used EIF as his chosen vehicle to carry out his vision and mission for the *Encyclopaedia Iranica*.

Dr. Yarshater remained a member of EIF's Board until 2018, stepping down only a few months before he passed away. SOF 22. During his time on the Board and while EIF's President, Dr. Yarshater

directed EIF's former counsel to draft by-laws confirming EIF's status as the owner of all intellectual property related to the *Encyclopaedia Iranica*. SOF 23. In relevant part, these by-laws state that "[t]he absolute and unqualified ownership of all aspects of the intellectual property of the *Encyclopaedia Iranica*, including copyright, trademark, reproduction rights electronically or mechanically of the *Encyclopaedia Iranica*, shall be vested in the Foundation" and that "[EIF] will be solely responsible to select, at its own discretion, the institutional base of the *Encyclopaedia Iranica*." SOF 23. Mr. Ahari, counsel for EIF at the time, testified that he drafted the by-laws based on Dr. Yarshater's input and has confirmed that to his knowledge Dr. Yarshater "100 percent agreed with" these statements. SOF 23. This position is further confirmed by the minutes from a meeting of EIF's Board in October of 2013. SOF 24

In accordance with Dr. Yarshater's intent for EIF to be the vehicle for carrying out the *Encyclopaedia Iranica*, he contracted to publish and distribute the *Encyclopaedia Iranica* since at least 1998, when EIF contracted with Eisenbrauns for the distribution of the *Encyclopaedia Iranica*. SOF 9. EIF directed Eisenbrauns to affix the ENCYCOPÆDIA IRANICA mark onto the printed *Encyclopaedia Iranica* fascicles and volumes. SOF 10. EIF also provided direction regarding the typeset to use for the ENCYCOPAEDIA IRANICA mark and what content to include on the cover of these printed fascicles and volumes. SOF 10. Dr. Yarshater renewed EIF's distribution contract with Eisenbrauns in 2013, signing as EIF's President. SOF 11. During this time as EIF's exclusive distributor, Eisenbrauns filed copyright applications on EIF's behalf. *See* SOF 12.

In addition to publishing the print version of the *Encyclopaedia Iranica*, EIF maintained ownership of and control over the official website of the *Encyclopaedia Iranica* hosted at www.iranicaonline.org since at least September 17, 2009, when EIF entered into an agreement with web developer, Electric Pulp. *See* SOF 26. To further assist with the development of content for the

22

online and print versions of the *Encyclopaedia Iranica*, EIF contracted with Clarivate to obtain a license for the ScholarOne content and workflow management platform. SOF 28.

In view of the evidentiary record, Dr. Yarshater was the original owner of all trademark rights in and to the ENCYCLOPÆDIA IRANICA mark as well as the copyrights for the *Encyclopaedia Iranica* and based on his actions confirmed via such testimony and exhibits, he transferred ownership and control of this intellectual property to EIF. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 18:4 (5th ed.) ("[a]n assignment in writing is not necessary to pass common law rights in a trademark."); *see also Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc*., 43 Fed. App'x 408, 412-13 (2d Cir. 2002). Accordingly, EIF's registration of the mark ENCYCLOPÆDIA IRANICA is proper and is based on at least two decades of continuous use of this mark in commerce.

> **(b)    Defendants are marketing a counterfeit product that features an imitation of EIF's ENCYCLOPÆDIA IRANICA mark.**

Defendants' counterfeit fascicles of the *Encyclopaedia Iranica* prominently feature an imitation of EIF's registered mark that replicates the same font, typeface, and context of EIF's own mark used on authorized fascicles and volumes of the *Encyclopaedia Iranica*. *See* SOF 38.

> **(c)    EIF is likely to prevail on its trademark counterfeiting and infringement claims, and has raised serious questions going to the merits to make them a fair ground for litigation**.

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Broker Genius, Inc. v. Volpone*, 313 F. Supp.3d 484, 497 (S.D.N.Y. 2018) (citations omitted). Moreover, a plaintiff is required to show only a likelihood of success on the merits as to a minimum of one claim asserted in a litigation. *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019).

23

To prevail on a trademark counterfeiting claim, a plaintiff must show ownership of a registered mark and that the defendant is using a spurious mark that is substantially indistinguishable from a registered mark. *See* 15 U.S.C. § 1114 (1)(a) and §§ 1116(d)(1)(A) and (B). There are two elements required for a trademark infringement claim brought under the Lanham Act: (1) the plaintiff's ownership of a valid trademark; and (2) the likelihood of confusion from the defendants' use of the trademark without the plaintiff's permission. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477 (2d Cir. 1996). For the first element, a certificate of registration with the USPTO is "*prima facie* evidence that the mark is registered and valid." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). For the second element, the standard for consumer confusion is easily satisfied in the case of counterfeit products "because counterfeits, by their very nature, cause confusion." *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012) (citation omitted) (granting summary judgment on infringement claim in favor of mark owner because "the marks used on both pairs of sunglasses are 'counterfeit' and, therefore, are by their very nature likely to cause confusion").

EIF has established a likelihood of success on both the infringement and counterfeiting claims. It owns a federal trademark registration for its ENCYCLOPÆDIA IRANICA mark. SOF 34. As noted above, registered marks are entitled to a presumption of validity. *See Lane*, 192 F.3d at 345. Moreover, EIF's ownership of this mark is apparent in view of the history of the *Encyclopaedia Iranica*. As explained above, Dr. Yarshater was the first person to affix this mark to a product and to use the mark in commerce, with the publication of Volume 1, Fascicle 1 of the *Encyclopaedia Iranica*. SOF 1-2. At that point he was the sole trademark owner.

He later established EIF as a vehicle for carrying out his vision for the *Encyclopaedia Iranica*, and instructed EIF's former counsel to create by-laws which reflected his assignment to EIF of all

intellectual property rights related to his *Encyclopaedia Iranica*. SOF 23. Dr. Yarshater's conduct as EIF's President and Editor-in-Chief of the *Encyclopaedia Iranica* further demonstrates his decision to vest ownership in EIF and for EIF to operate as the publisher of the *Encyclopaedia Iranica*. SOF 9, 19-25. Importantly, he established a policy by which authors would transfer copyright rights for their articles directly to EIF using a release form, rather than initially vesting this right in himself. SOF 48. He also had EIF enter into an exclusive distribution agreement with Eisenbrauns, which established EIF as the "Publisher" of the *Encyclopaedia Iranica* from the late 1990s through 2017. SOF 9. He also contracted with Electric Pulp to redesign and maintain the content hosted on the online version of the *Encyclopaedia Iranica*. SOF 26. Dr. Yarshater could have signed these agreements in his personal capacity. However, in both cases, he decided that EIF was the appropriate party, demonstrating EIF's ownership of the ENCYCLOPÆDIA IRANICA mark and copyrights related to the published materials.

Having established EIF's valid claim to ownership of its federally registered ENCYCLOPÆDIA IRANICA mark, the only other element required to support EIF's Lanham Act infringement claim is to show that Defendants' conduct is likely to cause consumer confusion. In this case, Defendants are marketing a counterfeit product that uses an identical imitation of EIF's registered mark ENCYCLOPÆDIA IRANICA , along with the same typeface and placement as the mark is used on EIF's products, and are selling this counterfeit product in precisely the same channels of trade as EIF. SOF 38-41.

In the Second Circuit, a likelihood of confusion is normally evaluated by applying the *Polaroid* factors. However, in cases involving counterfeit goods, this Court has recognized that a step-by-step likelihood of confusion analysis *is not required* because "counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Felizardo*, No. 03-cv-05891, 2004 WL 1375277, at *5 (S.D.N.Y. June 18,

2004) (quotations and citations omitted); *see Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("In this case . . . the Court need not undertake a factor-by-factor analysis . . . because counterfeits, by their very nature cause confusion."); *Topps Co. v. Gerrit J. Verburg Co.*, No. 96-cv-07302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) (finding no need to engage in a complete discussion of the *Polaroid* factors "[w]here the marks are identical, and the goods are also identical and directly competitive"); *Lois Sportswear*, 799 F.2d at 873 (affirming that an "essentially identical" mark "no doubt is likely to cause consumers to believe that [the plaintiff] somehow is associated with [the defendant] or at least has consented to the use of its trademark"). [4]

Even though evidence of confusion is not required for counterfeit marks, such evidence exists here. Indeed, Columbia **twice admitted** on its own website that there is now "confusion among contributors and other scholars in the field." SOF 40. No such confusion existed until Columbia began using counterfeit imitations of EIF's registered trademark. During the evidentiary hearing, Mr. Rouhani offered testimony that provides further evidence of actual confusion. SOF 41. As he explained, authors are confused and have contacted EIF because they are unsure where to submit articles, while donors have expressed hesitance to donate to EIF, questioning the legitimacy of EIF's authorized version of the *Encyclopaedia Iranica* because of Columbia's counterfeit version. SOF 41

Evidence of actual confusion in the marketplace—as admitted by Columbia—"almost inevitably establishes irreparable harm" and "also serves as additional evidence with respect to the separate finding that must be made of plaintiff's likelihood of success on the merits." *Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 41 (2d Cir. 1986) (citations omitted); *CJ Products v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011) (granting

---

[4] EIF raised this same principle and case citation in its initial briefing, and Defendants never even addressed it—thereby conceding it. *See* ECF 76-1 at 9.

preliminary injunction and finding evidence of irreparable harm when the products were "extraordinarily similar in appearance" and there was evidence of actual confusion). "Absent special circumstances, courts will ordinarily grant a preliminary injunction in a trademark infringement action if there is strong evidence of a likelihood of confusion." Restatement Third, Unfair Competition § 35, comment h (June 2020 Update).

In view of this admitted evidence of actual confusion, and the fact that Defendants' counterfeit products are effectively identical to EIF's own marked products, it is all but certain that EIF will demonstrate a likelihood of confusion among consumers, if this case proceeds to trial.

> **(d)     Defendants are barred from challenging EIF's copyrights for the *Encyclopaedia Iranica*.**

It is well established that in all actions under the Copyright Act, "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The three-year period starts when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (citation omitted). The first publication of a work listing a copyright ownership claim triggers the clock. *See Kwan*, 634 F.3d at 229 (2d Cir. 2011).

EIF has obtained copyrights for the volumes and fascicles of the *Encyclopaedia Iranica* that it published. SOF 12. Indeed, since 2003, EIF has been listed as the sole copyright owner in the copyright notice included in every volume, and plainly stated on the back cover of every fascicle. SOF 47. EIF's claim to sole ownership of these copyrights has therefore been open and notorious for the past 17 years, providing either actual or constructive notice to Columbia. As such, Columbia is barred from challenging EIF's claim to ownership of these volumes and fascicles, which published more than three years before the present dispute. Any other outcome would be inequitable. Dr. Yarshater and EIF spent years of effort and money to develop the *Encyclopaedia Iranica* into a recognized and respected

scholarly work. Columbia, by contrast, expended no resources or money, and instead lied in wait for

Dr. Yarshater to pass away to then take over his legacy. "It is inequitable to allow the [newcomer] to

lie in the weeds for years . . . while large amounts of money are spent developing a market for the

copyrighted material, and then pounce on the prize after it has been brought by another's effort." *Tomas*

*v. Gillespie*, 385 F. Supp. 2d 240, 246 (S.D.N.Y. 2005) (citation omitted).

> **(2)    EIF has demonstrated that it is likely to suffer irreparable harm absent a preliminary injunction.**

Although irreparable harm is not necessarily presumed upon a showing of a likelihood of

success (*see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006)), this Court has

recognized that "[i]rreparable harm exists in a trademark case when the party seeking the injunction

shows that it will lose control over the reputation of its trademark . . . because loss of control over one's

reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA*

*Holdings, Inc*., 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011); *see also New York City Triathlon*, 704 F.

Supp. 2d at 325 ("Every day that Defendant operates with Plaintiff's name, the ability of Plaintiff to

signify its services and its reputation by its [] Marks is lessened."). Thus, a demonstration of a

likelihood of success on a trademark claim often supports a finding of irreparable harm because of the

inherent reputational nature of the claims. *See Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334–35

(S.D.N.Y. 2011). Under Second Circuit precedent, actual harm "almost inevitably establishes

irreparable harm" and "also serves as additional evidence with respect to the separate finding that must

be made of plaintiff's likelihood of success on the merits." *Church of Scientology*, 794 F.2d at 41

(citations omitted). The Restatement supports this. *See* Restatement Third, Unfair Competition § 35,

comment h (1995).

As explained above, Defendants are marketing a counterfeit product featuring an imitation of

EIF's registered mark, in the same channels, and to the same potential customers. SOF 38-41. Unusual

in a trademark case, Defendants **admit** that actual confusion is ongoing in the marketplace. SOF 40. Based on these facts alone, the Court should find that irreparable harm is likely, if an injunction is not granted. EIF lost control over the reputation of its trademark when Columbia began selling counterfeit fascicles and causing actual confusion among prospective customers. Members of the academic community have contacted EIF expressing confusion, and potential donors have become hesitant to contribute to EIF due to the existence of Defendants' counterfeit version of the *Encyclopaedia Iranica* in the marketplace. SOF 41. EIF has suffered (and will continue to suffer) irreparable harm to its viability as a non-profit organization, as well as to the goodwill and reputation that it built with the ENCYCLOPÆDIA IRANICA mark due to Defendants' willful sales and distribution of its counterfeit *Encyclopaedia Iranica*. "If left unremedied, the immediate and irreparable harm to [movant] resulting from [infringer's] unlawful acts would far exceed any theoretical harm to [infringer] from an improvidently granted injunction." *New York City Triathlon*, 704 F. Supp. 2d at 326. Enjoining Defendants from using counterfeit imitations of EIF's ENCYCLOPÆDIA IRANICA mark will simply preserve the *status quo ante*. *See N. Am. Soccer,* 883 F.3d at 37.

### (3) The balance of hardships tips in EIF's favor.

If an injunction is denied, EIF is likely to suffer irreparable harm. Columbia has admitted that its counterfeit product is already causing actual confusion in the marketplace. SOF 40. This confusion is beginning to harm EIF's reputation and the goodwill associated with its mark, as evidenced by the confusion expressed by members of the academic and donor communities. SOF 41. As not-for-profit public charity, EIF relies heavily upon the goodwill and reputation that it built with the ENCYCLOPÆDIA IRANICA mark to raise funding to carry out its mission to maintain and publish the *Encyclopaedia Iranica*. Without these contributions, EIF will likely become non-viable as a public charity if this harm continues. SOF 40.

In contrast, if an injunction is granted, the *status quo ante* will be restored, with EIF once again

the exclusive publisher of the *Encyclopaedia Iranica*. Defendants would remain free to continue publishing articles on Iranian culture and history during the course of this litigation, both online and in print; they would simply have to do so without using EIF's registered mark. The *Encyclopaedia Iranica* has always been a scholarly work first and foremost, and has essentially no commercial value. SOF 46. Consequentially, Defendants stand to suffer little, if any, loss of revenue, if an injunction is granted.

**(4)     The public interest would be served with a preliminary injunction.**

The public interest also favors EIF and preventing further consumer confusion, as "the public has an interest in not being deceived — in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon*, 704 F. Supp. 2d at 344; *see also NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328, 342 (S.D.N.Y. 2014) (consumers have a "protectable interest in being free from confusion, deception and mistake"). Defendants have admitted that their counterfeit product is causing actual confusion in the marketplace. SOF 40. Testimony further confirmed that this actual confusion is ongoing. SOF 41. Absent intervention from the Court, this confusion will only increase over time. The general public—and in particular the academic community—would benefit from an injunction, because it would avoid further confusion stemming from Columbia's attempt to bifurcate the *Encyclopaedia Iranica*.

**IV.     CONCLUSION**

For the foregoing reasons, EIF respectfully requests that the Court grant the relief requested.

Dated:  September 3, 2020                    Respectfully submitted,

           New York, New York               /s/ *Marylee Jenkins*
                                            Marylee Jenkins

                                            Michael Scarpati
                                            David Yearwood
                                            ARENT FOX LLP
                                            1301 Avenue of the Americas, Floor 42
                                            New York, NY 10019
                                            Tel: (212) 484-3928
                                            Fax: (212) 484-3990

                                            Michael Grow (admitted *pro hac vice*)
                                            Taniel Anderson (admitted *pro hac vice*)
                                            ARENT FOX LLP
                                            1717 K St., NW
                                            Washington, DC 20036
                                            Tel: (202) 857-6000
                                            Fax: (202) 857-6395

                                            *Attorneys for Consolidated Plaintiff*
                                            *Encyclopaedia Iranica Foundation, Inc.*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2020, a copy of the foregoing document, as well as copies of the above-identified declarations and exhibits in support thereof, was served by the Court's ECF system on counsel for Defendants, as follows:

| For defendants Columbia and Daniel: | For defendant Brill: |
|---|---|
| Andrew Schilling<br>Amanda Lawrence<br>Brian Wegrzyn<br>Daniel Alonso<br>Benjamin Klubes<br>Megan Whitehill<br>Alyssa Helfer<br>Buckley LLP<br>1133 Avenue of the Americas, Suite 3100<br>New York, NY 10036<br>aschilling@buckleyfirm.com<br>alawrence@buckleyfirm.com<br>bwegrzyn@buckleyfirm.com<br>dalonzo@buckleyfirm.com<br>bklubes@buckleyfirm.com<br>mwhitehill@buckleyfirm.com<br>ahelfer@buckleyfirm.com<br><br>Robert Clarida<br>Jocelyn Jacobson<br>Reitler Kailas & Rosenblatt, L.L.C.<br>885 Third Avenue<br>20th Floor<br>New York, NY 10022-7604<br>rclarida@reitlerlaw.com<br>jjacobson@reitlerlaw.com | Sigmund Roos<br>Block & Roos LLP<br>2 Liberty Square<br>Suite 11th Floor<br>Boston, MA 02109<br><br>Andrew P. Schriever<br>Cuddy & Feder LLP<br>445 Hamilton Avenue, 14th fl.<br>White Plains, NY 10601 |

Dated: September 3, 2020

                                  */s/ David Yearwood*