**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK,

                    Plaintiff,

          v.                                                    No. 19 Civ. 7465 (AT)(KNF)

ENCYCLOPAEDIA IRANICA FOUNDATION,

                    Defendant.

---

ENCYCLOPAEDIA   IRANICA   FOUNDATION,
INC.,

                    Plaintiff,                                  No. 19 Civ. 8562 (AT)(KNF)

          v.

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, ELTON DANIEL
AND BRILL USA, INC.,

                    Defendants.

**MEMORANDUM OF LAW OF COLUMBIA UNIVERSITY**
**AND ELTON DANIEL IN OPPOSITION TO EIF'S POST-HEARING BRIEF IN**
**SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 4

EIF'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED .................... 4

   I.   EIF Has Not Established a Likelihood of Success.............................................. 4

     A. Professor Yarshater's Work on the Encyclopedia Was Within the Scope of His
       Employment at Columbia ............................................................................. 4

     B. EIF's Contested Trademark Registration, Obtained by Fraud and For Purposes of This
       Litigation, Does Not Establish Ownership ................................................... 14

     C. EIF's Actions After 1990 Are Irrelevant to the Question of Trademark Ownership .. 15

     D. Professor Yarshater Could Not, and Did Not, Transfer Ownership in the Mark to
       EIF ......................................................................................................... 17

     E. EIF Has Not Established a Likelihood of Success On Its Counterfeiting Claim ........ 17

     F. The Timeliness of Columbia's Copyright Claims is Irrelevant ................................. 20

   II.  EIF Has Not Demonstrated Irreparable Harm ................................................. 22

   III. EIF Has Not Demonstrated a Balance of Hardships in Its Favor .................................... 23

   IV. EIF Has Not Demonstrated that an Injunction Is In The Public Interest ........................ 24

CONCLUSION................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
  131 F. Supp. 3d 196 (S.D.N.Y. 2015).......................................................................21

*City of New York v. FedEx Ground Package Sys., Inc.*,
  351 F. Supp. 3d 456 (S.D.N.Y. 2018).......................................................................10

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
  228 F.3d 56 (2d Cir. 2000).......................................................................................21

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
  897 F.3d 413 (2d Cir. 2018)................................................................................14, 15

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
  175 F.3d 144 (2d Cir. 1999).....................................................................................22

*Haedrich v. Akers*,
  No. 342342, 2019 WL 1645251 (Mich. Ct. App. Apr. 16, 2019) ..............................9

*Hana Fin. v. Hana Bank*,
  574 U.S. 418 (2015).................................................................................................14

*Hirsch v. Columbia Univ.*,
  293 F. Supp. 2d 372 (S.D.N.Y. 2003).......................................................................11

*Lerner v. Amalgamated Clothing & Textile Workers Union*,
  938 F.2d 2 (2d Cir. 1991).........................................................................................11

*Liebowitz v. Elsevier Science Ltd.*,
  927 F. Supp. 688 (S.D.N.Y. 1996) ...........................................................................20

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
  Contemporary Dance Inc.*,
  380 F.3d 624 (2d Cir. 2004).....................................................................................11

*Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir.1999).......................................................................................22

*Rouse v. Walter & Assocs., L.L.C.*,
  513 F. Supp. 2d 1041 (S.D. Iowa 2007) .....................................................................9

*Sec. & Exch. Comm'n v. Vesco*,
  358 F. Supp. 1186 (S.D.N.Y. 1973)............................................................................8

*Sills Rd. Realty LLC v. Town of Brookhaven*,
     No. CV 07-4584 (TCP) (ETB), 2008 WL 11449282 (E.D.N.Y. July 10, 2008) ...................... 8

*Trustees of Columbia University in the City of N.Y. v. Town of Orangetown*,
     402 N.Y.S2d 899, 903 (Rockland Cty. 1976), *aff'd*, 399 N.Y.S.2d 708 (2d
     Dep't 1977) ................................................................................................................................ 5

*Vanderbilt Univ. v. Scholastic, Inc.*,
     382 F. Supp. 3d 734 (M.D. Tenn. 2019) .................................................................................. 9

**Other Authorities**

1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 6:14
     (4th ed. 1996) ........................................................................................................................... 21

The Trustees of Columbia University in the City of New York ("Columbia") and Elton Daniel respectfully submit this memorandum of law in opposition to the post-hearing brief filed by Encyclopaedia Iranica Foundation, Inc. ("EIF") in support of its motion for a preliminary injunction.

## PRELIMINARY STATEMENT

In its post-hearing brief, EIF is forced to acknowledge what was abundantly clear from the hearing evidence:  EIF was not the first to use the mark in commerce and has never controlled the content of the *Encyclopaedia Iranica*.  Indeed, EIF did not even exist for the first eight years during which the *Encyclopaedia* was published.  Because that one fact is fatal to its trademark claims, EIF grasps for the only argument left to it – *i.e.,* that Columbia had nothing to do with the publication, and that "Dr." (conspicuously no longer referred to as "Professor") Yarshater was simply acting on his own, in his "personal" capacity, in connection with this project.  As EIF would tell it, the Center for Iranian Studies at Columbia University is "just an address" and not an actual subdivision of the University; and that when a tenured Professor of Iranian Studies publishes a work on Iranian studies, through the Center for Iranian Studies, he is acting "outside the scope" of his employment.  Indeed, EIF goes so far as to say – all evidence to the contrary – that the Center for Iranian Studies had no Columbia employees in the 1980s when the *Encyclopaedia* was being edited and published – not even Professor Yarshater, whom they claim was a mere "volunteer." EIF makes these claims in the face of undisputed evidence that Professor Yarshater was an active, long-term, tenured, and salaried Columbia employee during the entire period prior to EIF's existence when the *Encyclopaedia* mark was first used in commerce, and that he remained the Director of the Center at Columbia and a Professor Emeritus until just prior to his death.

EIF's claims are not only ridiculous on their face; they are also flatly contradicted by the hearing evidence, which showed Columbia's extensive role with respect to the *Encyclopaedia* over the years, including controlling the content and quality of the work.  And EIF's claims contradict the countless statements that EIF itself made before this dispute arose, when it publicly acknowledged – over and over, both to its donors and to the government – that the *Encyclopaedia* is a project of Columbia University.  Not surprisingly, the only "evidence" EIF points to in support of its specious claims is the testimony of its own, self-interested Board members.  The Court should disregard that testimony because it conflicts with all available evidence, and it is incredible on its face.

The facts show beyond doubt that the Center is and has been for seventy years[1] an actual Columbia entity, sharing in Columbia's corporate identity, and that the Center and its employees, including (but not limited to) Professor Yarshater, have always been subject to Columbia authority. The *Encyclopaedia* is one of many publication projects undertaken at the Center and has been financed overwhelmingly by federal donors (*i.e.*, the National Endowment for the Humanities ("NEH")) and public donors other than EIF.  Professor Yarshater was appointed Director of the Center by Columbia, and was at all times subject to Columbia authority over his handling of the Center and its projects.  This important scholarly work was squarely within the scope of his duties and relied heavily on Columbia employees and other resources, irrespective of the degree to which he himself was compensated at any particular time.  Indeed, the very fact that Professor Yarshater

---

[1] *See* "Columbia to Found Iran Study Center," *The New York Times*, Dec. 20, 1949 ("[e]stablishment of a Center of Iranian Studies at Columbia University was announced last night"), available at https://timesmachine.nytimes.com/timesmachine/1949/12/20/96489752.html?pageNumber=33.

was designated the principal investigator on multiple Columbia federal grant applications shows that he was working for Columbia and acting within the scope of his duties.

More importantly, EIF never provided anything other than financial support for any aspect of this project and had no role in the actual production of the *Encyclopaedia*, a fact EIF freely admitted until it broke ties with Columbia.  By its own admission, EIF played no part in the academic and technical aspects of the project.  EIF's story changed following its rift with Columbia, after which it has attempted, in Orwellian fashion, to re-write the history of this project to purge any reference to Columbia University, the home and sponsor of this project for decades, a fiction EIF now peddles before the Court.  These efforts included removing references to Columbia from the *Encyclopaedia*'s website after EIF unlawfully gained access to it and EIF's fraudulent application for a trademark registration in 2018, when EIF's Chairman went so far as to falsely represent to the federal government that no one had used the mark before 2003, a fact he knew to be false.

Finally, and perhaps in its most disingenuous argument, EIF endeavors to present itself as the heir of Professor Yarshater's work and the defender of his wishes, without producing a shred of written evidence to substantiate this fiction.  To the contrary, the evidence before the Court shows what Professor Yarshater wanted, and he did not want EIF to be doing what EIF is now seeking to do.  In a notarized letter written only months before he died, (Ex. U at 1), Professor Yarshater made it clear that he expected the *Encyclopaedia Iranica* to continue to have a secure home at Columbia University, and that he wanted both EIF and the Persian Heritage Foundation ("PHF") to endow the Center with substantial gifts.  EIF rejected Professor Yarshater's request. Instead, EIF maneuvered to convert this Columbia project into a vanity project for the benefit of the small group of Wall Street bankers who control EIF.  It then commenced this litigation with

3

the goal of shutting down the publication after four successful decades of publication.

Rather than carrying out Professor Yarshater's wishes, EIF's motion represents the ultimate betrayal of his vision by seeking to stop publication of his life's work. This Court should not let that happen. The motion should be denied.

## ARGUMENT

## EIF'S MOTION FOR A PRELIMINARY INJUNCTION
## SHOULD BE DENIED

To demonstrate its entitlement to the "extraordinary and drastic remedy" of a preliminary injunction, the moving party must, "by a clear showing, carr[y] the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (internal quotation marks and citations omitted). Specifically, the moving party must demonstrate "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted). The moving party must also show that a preliminary injunction "is in the public interest." *Id.* Here, the evidence presented at the hearing demonstrates that EIF cannot satisfy this demanding standard.

## I.    EIF Has Not Established a Likelihood of Success

### A. Professor Yarshater's Work on the *Encyclopaedia* Was Within the Scope of His Employment at Columbia

EIF acknowledges that, to prevail in this case, and thus on this motion, it must demonstrate that it was the first to use the trademark in commerce. (EIF Br. at 16). EIF also acknowledges, as it must, that the *Encyclopaedia Iranica* mark was first used in commerce in 1982. (EIF Br. at 17). And EIF of course could not even claim any involvement in the project in 1982, or in any of the

years between 1982 and 1990, because EIF did not exist until 1990.  (Ex. 3 at 7).  EIF also recognizes that, under the "work for hire" doctrine, an employer owns the intellectual property of its employees produced within the scope of their employment.  (EIF Br. at 20).   To avoid the obvious ramifications of these key admissions, EIF claims that Professor Yarshater alone – and without any support from Columbia – created and published the *Encyclopaedia* in his "personal" capacity, (EIF Br. at 25), and that his work was outside the "scope of his employment" at Columbia.  (EIF Br. at 20).  The evidence overwhelmingly established, however, that producing the *Encyclopaedia* fell squarely within the scope of Professor Yarshater's employment at Columbia.

The hearing evidence established that the Center is part of Columbia University (Tr. 288:15; Ex. MM at 1, OO at 5; Supplemental Declaration of Margaret Edsall, dated August 11, 2020, ECF No. 99 ("Supp. Edsall Decl.") ¶ 3); that the Center produces the *Encyclopaedia* and controls the content and quality of the work (Tr. 259:1-5-13; Ex. W at 2, 9-10; Ex. C at 7; Ex. MM at 1; Ex. OO at 5; Ex. SS at 2, 8, 20; Supplemental Declaration of Elton L. Daniel, dated August 11, 2020, ECF No. 97 ("Supp. Daniel Decl." ¶ 7); Declaration of Mohsen Ashtiany, dated August 11, 2020, ECF No. 98 ("Ashtiany Decl.") ¶ 6); that Columbia appoints the Center Director, which is a Columbia position (Tr. 252:5-13; Ex. O at 1; Tr. 223:4-224-5; Ex. R at 1; Supp. Daniel Decl. ¶ 4); and that Columbia has overseen the Center, its Director, and its employees, including Professor Yarshater specifically (Tr. 225:1-23; *accord* Tr. 265:22-23 ("every person working at the Center is supervised by Columbia staff").[2]   In addition, the hearing evidence, including

---

[2]   EIF continues to insist – without factual or legal support – that the Center does not exist because it is not separately incorporated.  (EIF Br. at 2).  That argument makes no sense.  The Center is not separately incorporated precisely because it is part of Columbia University.  *See, e.g., Trustees of Columbia University in the City of N.Y. v. Town of Orangetown*, 402 N.Y.S2d 899, 903 (Rockland Cty. 1976) (holding that Columbia research institute was not a "separate entity" from Columbia

employment records and testimony, established that Professor Yarshater served as the Director of the Center from 1977 until 2016; that he served as a Professor of Iranian Studies from 1960 to 1990; that he served as a Special Lecturer from 1991 to 2002; and that he served as Professor Emeritus at Columbia from 1990 until he died in 2018.  (Ex. JJ at 1-2; Supp. Edsall Decl. ¶¶ 4-5; Tr. 214:16-215:5; 231:9-11).  In other words, he held appointed positions with Columbia from the very outset of the project until his death.   Further, the NEH grant applications for the *Encyclopaedia* were all submitted with "The Trustees of Columbia University in the City of New York" as the "applicant" and identify Professor Yarshater as the "Project Director" and "Principal Investigator" on behalf of Columbia.  (Ex. OO at 1, 2, 32, 33; Ex. SS at 2, 3, 34; Ex. VV at 4, 9, 10, 42).   Finally, the hearing evidence established that Professor Yarshater was bound by University policies and subject to University oversight, including specifically in connection with his work as Director of the Center (Tr. 225:18-23), just as Dr. Daniel is today in the Interim Director role.  (Ex. O at 1).  There can thus be no doubt that, when Professor Yarshater worked on the *Encyclopaedia*, he did so within the scope of his employment with Columbia.

Grasping at straws, EIF argues that Professor Yarshater was somehow not acting within the scope of his employment at Columbia when he worked on the *Encyclopaedia* because he did not receive a salary ***as Center Director***.  (EIF Br. at 20).  That argument ignores the hearing evidence.  First, the hearing evidence established that Professor Yarshater was a ***salaried*** Columbia employee from 1958 through 2002, ***including*** in 1982, when the mark was first used in commerce.  (Ex. JJ at 1-2).  Second, the hearing evidence established that even non-salaried appointees at

---

University: "The University is the sum of the total of its parts."), *aff'd*, 399 N.Y.S.2d 708 (2d Dep't 1977).  If evidence were even necessary, the hearing evidence established that the Center is part of Columbia.  (Tr. 288:15; Ex. MM at 1; Ex. OO at 1).

Columbia are nevertheless subject to Columbia oversight and control.  As Columbia Vice President Margaret Edsall testified, directors of small centers at Columbia typically do not receive a separate salary for serving as a director; but they hold their positions by virtue of an administrative appointment from the University and remain subject to University policies and procedures, "as any chair of a department would."  (Tr. 225:1-5; *see also* Tr. 223:18-19 ("[Columbia has] a variety of these non-salaried appointments, ***and these people are employees***") (emphasis added)).  Ms. Edsall had personal knowledge of Professor Yarshater's employment status within the University, as well as the relationship between the Center and the University, having personally worked with Professor Yarshater in his capacity as Center Director at the University to ensure its compliance with Columbia policy.  (Tr. 214:13-15); *see also* Tr. 225:18-23 ("I also helped to manage the activities of the center and invited him to directors' meetings where we went over policies and procedures.  I oversaw the academic reviews, which included this center.  And I helped him realize the academic mission of the center according to university policies and procedures.").

EIF also claims that Professor Yarshater could not have been an "employee" after 1990 because he retired in that year.  (EIF Br. at 20).  As an initial matter, by 1990, Columbia had been using the mark in commerce for ***eight years***, thereby establishing its ownership.  But even if it mattered, EIF's claim is factually incorrect.  While Professor Yarshater retired *as a professor* in 1990, he continued to hold multiple positions at the University after that date, including most notably as Center Director.  (Ex. JJ at 1-2).  He also was Special Lecturer until 2002, a position for which he was paid by Columbia.  (Ex. JJ at 1-2).  In addition, Professor Yarshater remained a Professor Emeritus from 1990 through his death in 2018.  (Tr. 231:9-10).  Notably, Professor Yarshater had expressly requested that Columbia grant him the status of Professor Emeritus "so

that I may conduct research after my retirement on 30th June 1990 and continue as editor and chief investigator of the *Encyclopedia Iranica*."[3]  Thus, Professor Yarshater himself recognized that his work on the *Encyclopaedia* was within the scope of his employment at Columbia and contingent upon the approval of Columbia.  Notably, when Professor Yarshater pursued a federal grant to support the *Encyclopaedia* in 2013, *i.e.*, after his "retirement," he identified himself in correspondence with the NEH, which he submitted on Columbia letterhead, as "Professor Emeritus of Iranian Studies" and "Director, Center for Iranian Studies" at Columbia University.  (Ex. VV at 3).

EIF also argues that publishing the *Encyclopaedia* did not fall within the scope of Professor Yarshater's duties as a "professor" specifically.  (EIF Br. at 20).  But that argument simply overlooks his position as Center Director, a Columbia position that EIF acknowledged he held until just before he died.  (Tr. 193:6-9).  In any event, the hearing evidence established that research and publishing fell within the scope of Professor Yarshater's position as Center Director.  (Ex. JJ at 1).  For example, Dr. Daniel testified that the duties and responsibilities of faculty at all major universities include "research and publication."  (Tr. 257:9-14).  In that regard, Columbia is obviously no exception.  Indeed, Dr. Daniel's own appointment letter expressly provides that his duties as a Senior Research Scholar include "directing the research activities in the Center for Iranian Studies, in particular, the Encyclopedia Iranica[.]"  (Ex. O at 1).  The facts of this case

---

[3]  Supplemental Declaration of Elton Daniel, dated September 17, 2020, Ex. VVV.  The Court has the discretion to consider these documents, even though they were not admitted into evidence during the hearing.  *See Sills Rd. Realty LLC v. Town of Brookhaven*, No. CV 07-4584 (TCP) (ETB), 2008 WL 11449282, at *1 (E.D.N.Y. July 10, 2008) (considering evidence first submitted in post-hearing brief in ruling on motion for preliminary injunction) ("[I]t is well-established that '[t]he strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction'").  EIF cannot claim any prejudice from the Court's consideration of these documents because they are cumulative of other hearing evidence showing that Professor Yarshater continued to work on the *Encyclopaedia* as Professor Emeritus after 1990.

therefore accord with well-settled law, which recognizes that university faculty act within the scope of their employment when they research and publish in their field of expertise. *See, e.g., Vanderbilt Univ. v. Scholastic, Inc.*, 382 F. Supp. 3d 734, 745 (M.D. Tenn. 2019) ("Tenure-track faculty are expected and encouraged to research, write, and create, and these activities fall within the scope and purpose of their employment"); *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1056 (S.D. Iowa 2007) ("[A]s ISU tenured faculty, Rouse and Wilson were expected to and did in fact engage in research activities."); *Haedrich v. Akers*, No. 342342, 2019 WL 1645251, at *6 (Mich. Ct. App. Apr. 16, 2019) (university professor was "expected to conduct research, publish, and contribute to the overall body of academic scholarship in [his] field.").[4]

Against all this evidence, the ***sole*** factual support EIF offers in support of its claim is the conclusory, self-serving testimony of its own Treasurer, Soody Nelson, who simply opined that Professor Yarshater's work on the *Encyclopaedia* "was never within the scope of his employment as a professor by Columbia." (EIF Br. at 5 (citing Ex. 35 (Declaration of S. Nelson, dated July 29, 2020, at ¶ 7))).  But Ms. Nelson offered no ***facts*** to support that conclusion, and there are none. Indeed, Ms. Nelson had no personal knowledge of Professor Yarshater's work at the Center, his employment records, or his working relationship with Columbia administrators at any time, let alone in 1982, when Columbia first began using the mark in commerce.  In fact, Ms. Nelson admitted at the hearing that she never even met Professor Yarshater until "around 2005."  (Tr.

---

[4]  EIF attempts to cast doubt on the issue by highlighting the fact that Columbia did not submit Professor Yarshater's offer letter or employment agreement. (EIF Br. at 19-20).  But as EIF knows, Professor Yarshater began teaching at Columbia in 1958, (Ex JJ at 1), which was well prior to the development of the *Encyclopaedia*.  Accordingly, that appointment letter was not offered because it obviously would not speak to these issues.  That the position of Center Director includes work on the *Encyclopaedia* within its scope is confirmed, however, by Dr. Daniel's appointment letter as Senior Research Scholar and Interim Director of the Center, which expressly references Dr. Daniel's expected work for the University in connection with the *Encyclopaedia.*  (Ex. O at 1).

165:15-17), and she did not join EIF's Board of Trustees and Board of Directors until 2012 and 2014, respectively.  (Tr. 190:16-19).  By that point, Columbia had been using the mark in commerce *for more than 30 years*.  (Ex. S at 1-3).  Ms. Nelson also admitted that, even after she joined the Board of Directors in 2014, she had a full-time job in finance and was not actually present at the Center.  (Tr. 193:16-19).  Accordingly, Ms. Nelson had no personal knowledge, or any other basis, to opine on the question of whether Professor Yarshater was acting within the scope of his employment at any time, particularly during the period from 1982 to 1990 before EIF existed.

EIF's related argument that Professor Yarshater acted in a "personal" capacity when he signed the contract with the *Encyclopaedia*'s first publisher Routledge (EIF Br. at 16) is equally baseless.  Because Professor Yarshater was acting within the scope of his employment when he worked on the *Encyclopaedia,* contracts he signed in connection with that project are "incidental to his employment" and therefore within the scope of his employment.  *See, e.g., City of New York v. FedEx Ground Package Sys., Inc.*, 351 F. Supp. 3d 456, 479 (S.D.N.Y. 2018) ("An act is within the scope of employment if it is performed while the employee is engaged generally in the business of the employer, or if his or her act may be reasonably said to be necessary or incidental to such employment.") (*citing Harisch v. Goldberg*, 2016 WL 1181711, at *14 (S.D.N.Y. Mar. 25, 2016).  Although EIF argues that Professor Yarshater did not seek approval from anyone else at the University before signing this contract or taking other actions on behalf of the Center (EIF Br. at 18-19), that has no bearing on whether he took those actions within the scope of employment.  *See FedEx Ground Package Sys., Inc.*, 351 F. Supp. 3d at 479 ("This is the case even if the knowledge of the employee performing the act is never communicated to his or her superior.") (citing *New York Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 n.2 (2d Cir. 2003)); *see, e.g., Martha Graham*

10

*Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance Inc.*, 380 F.3d 624, 642 (2d Cir. 2004) ("It is true that the Center did not exercise much control over Graham, but the absence of a hiring party's *exercise* of control does not mean that an artist is not an employee where other factors weigh in favor of finding an employment relationship.") (emphasis in original).

Moreover, the contract with Routledge, on its face, belies the claim that Professor Yarshater signed it in a "personal" capacity.   In fact, the contracting party is identified by reference to Yarshater's Columbia title ("Professor") and explicitly references the "Center for Iranian Studies" at "Columbia University."  (Ex. HHH at 1).  It is telling that EIF cites no law to support its argument that the contract was signed in a "personal" capacity; in fact, no law supports such a claim.   To the contrary, the law **presumes** that contracts signed by the agent of a disclosed principal are entered into on behalf of the principal, and **not** in the signer's individual capacity.   *See Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5-6 (2d Cir. 1991) ("New York courts have found individual liability only in rare cases" since there must be "overwhelming evidence of the signatory's intention to assume personal liability."); *see e.g., Hirsch v. Columbia Univ.*, 293 F. Supp. 2d 372, 378-79 (S.D.N.Y. 2003) (agreement signed by "Herbert Pardes, M.D., Vice President for the Health Sciences and Dean of the Faculty of Medicine" at Columbia was not entered into by Dean Pardes personally).   Accordingly, when Professor Yarshater signed the contract with Routledge in 1981, he did so in his capacity as an employee and on behalf of the University.

EIF's statement (without citation to anything) that Professor Yarshater "did not rely on Columbia to fund his project" because he was independently wealthy (EIF Br. at 19) is remarkable. The hearing evidence established that Columbia provided substantial financial and administrative support to this project from its inception decades ago and continuing until this day.  Among other

things, Columbia secured more than $5 million in federal grants from NEH to fund the project (Ex. OOO at 1-8), even allowing the Center to retain the portion of those grants that would normally go to Columbia for overhead (Ex. OO at 31); Columbia paid the salaries of Professor Yarshater, Dr. Daniel, and the other Center employees (Ex. JJ at 1-2, Ex. KK at 1-4; Supp. Daniel Decl. ¶ 4); and Columbia paid the honoraria to the authors who contributed articles from Columbia funds (Ashtiany Decl. ¶ 11; Ex. DD at 1-2, Ex. EE at 1-2, Ex. FF at 1-2, Ex. GG at 1-2, Ex. HH, Ex. II).[5] Columbia also contributed administrative support, office space, and library resources.  (Ex. SS at 20; Ex. VV at 27).  If Professor Yarshater could simply have funded everything himself, he would not have established EIF to raise money for the project from others (Ex. C at 8); he would not have worked with Columbia to secure millions of dollars in federal grants (Ex. OO at 1, 5; Ex. SS at 2, 8; Ex. VV at 9-11); and he would never have asked both EIF and PHF to contribute money to Columbia to support this project (Ex. U at 1).

EIF's related claim that Professor Yarshater somehow produced the *Encyclopaedia* all by himself is also flatly contrary to the hearing evidence.  (EIF Br. at 18).  While Professor Yarshater certainly played a substantial role in the project in its early years, EIF's claim that he acted on his own is belied by the hearing record.  First, as Columbia established at the hearing, the Center employed research scholars, editors, and administrative staff that carried out the day-to-day work of producing the *Encyclopaedia*, including Dr. Daniel, Ahmad Ashraf, Mohsen Ashtiany, Dagmar Riedel, Sergey Turkin, Houra Yavari, Mahnaz Moazami, Vahid Noshirvani, Habib Borjian,

---

[5] Although EIF claims that Dr. Daniel's salary "was paid by EIF" (EIF Br. at 11), the facts do not support that odd and demonstrably false assertion.  (Tr. 255:23-24; Ex. O at 1-2; Ex. KK at 2). EIF presumably makes such claims because it, along with many others, was a donor to the Center for many years.  But that does not mean that EIF paid anyone's salary, any more than any graduate who donates to his or her school could claim to have paid the salaries of every staff member of their alma mater.

Kioumars Gheregiou, and Majdoddin Keyvani.  (Ex. KK at 1-4).  In addition, Columbia's grant applications to NEH detail the critical role played by these research scholars and editors, who are listed by name.  (Ex. SS at 23, 34-35 (listing editorial staff and noting also that "Columbia undergraduate and graduate students are employed as work-study and research assistants, respectively, whenever available")).  EIF's brief and hearing presentation completely ignored all these Columbia employees because their very existence cannot be squared with EIF's false narrative that Professor Yarshater acted alone.  Indeed, Professor Yarshater himself has acknowledged the importance of the staff editors at the Center.  (Ex. W at 2-3, 8 (Yarshater describing Encyclopedia as "a project of Columbia University" and describing Center staff)).  EIF also has no response to the unchallenged testimony of Mohsen Ashtiany, a salaried Columbia employee who has served as one of the associate editors of the *Encyclopaedia* for more than twenty years.  (Ashtiany Decl. ¶¶ 2-12).

EIF also falsely suggests that no Columbia employees worked at the Center before 1990 (EIF Br. at 2); but its argument rests upon a mischaracterization of the evidence.  As Ms. Pearl Spiro testified, Exhibit KK reflects a report of Columbia employees who worked at the Center "from 1990 to the present."  (Declaration of Pearl Spiro, dated August 11, 2020, ECF No. 101 ¶ 6).  That report did not purport to represent *all* employees of the Center *ever*.  Indeed, each fascicle published from 1982 to 1990 specifically identified the "Editorial Staff" that worked on the fascicle.  (*See, e.g.* Ex. S at 2, 8 (identifying Editorial Staff); *see also, e.g.,* Ex. SS at 48 (resume of Dr. Christopher Brunner identifying his role on the *Encyclopaedia* as "Senior Assistant Editor, Center for Iranian Studies, Columbia University" from October 1974 to December 1981); Tr. 28:12-13 (identifying Manouchehr Kasheff as "an assistant editor since 1984," *i.e.,* before EIF was established)).  Accordingly, even prior to 1990, Professor Yarshater was never the sole Center

employee nor the sole Columbia employee working on the *Encyclopaedia.*

Thus, contrary to EIF's characterization, the *Encyclopaedia* was never one man's personal project; it has always been, a "Columbia University project," as EIF has repeatedly acknowledged. (Ex. K at 34; Declaration of Megan E. Whitehill, dated July 28, 2020, ECF No. 83 ("Whitehill Decl."), Ex. E at 31; Whitehill Decl. Ex. H at 43).

### B. EIF's Contested Trademark Registration, Obtained by Fraud and For Purposes of This Litigation, Does Not Establish Ownership

EIF also argues that it owns the trademark because it registered the trademark with the United States Patent and Trademark Office ("PTO"). (EIF Br. at 16). But that of course is not the law. As the Second Circuit has clearly explained, "***registration creates no substantive trademark rights*** against infringement beyond the common law rights acquired through use of the mark." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018) (emphasis added) (quoting *Time, Inc. v. Peterson Park Co. LLC*, 173 F.3d 113, 118 (2d Cir. 1999)). Thus, ownership vests in the first user, not any later registrant. *See Hana Fin. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce."). In *Excelled Sheepskin*, for example, the district court enjoined defendant from using a trademark because plaintiff had registered it with the PTO. The Second Circuit vacated that injunction, however, holding that it was the defendant's prior use of the mark that established its ownership, not plaintiff's later PTO registration. 897 F.3d at 419. ("Notwithstanding Excelled's PTO registrations in 2003, 2004, 2007, and 2011, OBC established its trademark rights through roughly twenty years of priority in deliberate and continuous nationwide use of the mark since 1989."). Likewise here, Columbia owns the trademark because

it was the first to use the mark in commerce, and EIF's later registration does not change that result. *Id.* ("Excelled's PTO registrations do not change our analysis.").

EIF's reliance on its PTO registration also fails because, as the evidence established, that registration was obtained by fraud, thus rendering it invalid. EIF's chairman, Mr. Ramine Rouhani, admitted at the hearing that EIF did not apply for trademark registration until after the relationship with Columbia had broken down. (Tr. 83:4-21). EIF's chairman also admitted that, in the trademark application he signed on behalf of EIF (Ex. 1.1 at 16), he stated that the mark was first used in 2003 (Ex. 1.1 at 1), which he knew was in fact 21 years after the *Encyclopaedia* was first published. (Tr. 84:2-7). That application also contained the representation that no other persons had rights to the mark (Ex. 1.1 at 16), which was also false. Nowhere on the application did EIF disclose to the PTO Columbia's prior use of the mark, even though Mr. Rouhani knew perfectly well that Columbia had used the mark in commerce and claimed rights in the mark. Accordingly, EIF made false representations to the PTO to obtain the trademark registration, which renders the trademark registration invalid.[6]

## C. EIF's Actions After 1990 Are Irrelevant to the Question of Trademark Ownership

Unable to establish trademark ownership through prior use, EIF seeks to muddle the issue by pointing to a variety of actions taken by EIF over the years after 1990, asking the Court to consider the entire "evidentiary record" on the issue of ownership. (EIF Br. at 23). For example, EIF points to contracts signed with Eisenbrauns, a distributor, and EIF's later administrative control over the website. (EIF Br. at 22). But these actions all significantly post-date Columbia's

---

[6] EIF states that Columbia's petition to the PTO to cancel its registration "has not proceeded beyond the petition stage," falsely implying that the cancellation proceeding has not been pursued. (EIF Br. at 16). But EIF knows full well that the PTO has stayed the cancellation proceeding pending the outcome of this litigation because this Court, and not the PTO, will be deciding these issues. (Whitehill Decl. Ex. C at 2-3).

first use of the mark in 1982, and thus do nothing to undermine Columbia's ownership of the mark as the senior user.

For example, the contract with Eisenbrauns was signed in 2013 (Ex. 10 at 4), *more than 30 years* after Columbia had been using the mark in commerce.  (Ex S at 1).  Also, this contract does not identify EIF as the trademark owner of the work but merely as the "publisher." (Ex. 10 at 1).  And as Dr. Daniel explained, in practice Eisenbrauns took its direction from the Center, not from EIF.  (Tr. 266:15-17).  Accordingly, even if EIF rather than Columbia had contracted with Eisenbrauns, that would do nothing to undermine Columbia's claim of ownership of the trademark, which it acquired decades earlier.

EIF also points to its alleged "ownership of and control over" the website, www.iranicaonline.org.  (EIF Br. at 22).  But again, EIF claims to have become involved in the website only beginning in 2009, *twenty seven years* after Columbia first used the mark in commerce.  And that claim is spurious, as it is based on a contract that Professor Yarshater signed on behalf of the "Encyclopedia Iranica," not EIF.  (Ex. 9 at 1).  Moreover, EIF's reliance on its "administrative" control over the website ignores the fact that it was Columbia and the Center – not EIF – that developed all the *content* for that site, as explained in detail in a grant application to NEH (which funded the website improvements).  (Ex. SS at 8).  More significantly, EIF maintains exclusive administrative control over the website today only because it commandeered administrative control after its rift with Columbia, after which the website was "taken over" by EIF.  (Tr. 264:22-265:9).  Accordingly, EIF's assumption of administrative control over a website domain that hosts content created by Columbia hardly provides evidence that EIF owns the trademark.

16

### D.  Professor Yarshater Could Not, and Did Not, Transfer Ownership in the Mark to EIF

For all these reasons, the trademark has always been owned by Columbia University.  As a result, the Court need not reach the question of whether Professor Yarshater could have transferred those rights to EIF because the rights at issue were never owned by Professor Yarshater in his personal capacity.  Although EIF declares it a "fact" that "Dr. Yarshater chose to vest EIF with his intellectual property rights" (EIF Br. at 21), that "fact" is followed by no factual support from the hearing – because there is none.  To the contrary, EIF produced no evidence at the hearing that Columbia ever transferred its ownership rights to Professor Yarshater or EIF, and EIF's witnesses admitted at the hearing that there is no document transferring ownership to EIF.  (Tr. 138:13-15; 21-22 (testimony of Mr. Nader Ahari stating "I do not have any documents reflecting this transfer" and "I don't recall having seen a document of that nature"); Tr. 195:13-18 (testimony of Ms. Soody Nelson stating "I believe I didn't say it was a transfer document, I said there are documentations of it, documenting statements that he wants to…")).  Moreover, EIF produced no evidence of any purported transfer of trademark ownership from Professor Yarshater to EIF.  Instead, EIF cites only a provision in its 2012 bylaws stating that one of its purposes is to hold ownership of the *Encyclopaedia*'s trademark rights.  But those bylaws do not purport to transfer any rights.  (Ex. 5 at 1).  And EIF produced no evidence that ownership of trademark rights was a purported "purpose" of EIF prior to 2012; indeed, EIF's articles of incorporation say nothing about ownership of the *Encyclopaedia*'s intellectual property.  (Ex. 4).  Accordingly, there is no evidence that Professor Yarshater could have or attempted to transfer ownership of the trademark to EIF.

### E.  EIF Has Not Established a Likelihood of Success On Its Counterfeiting Claim

EIF's alternative claim alleging "trademark counterfeiting" (EIF Br. at 24) fails for all the same reasons as its claim of trademark infringement: both claims require EIF, as a threshold matter,

to prove that it owns the trademark.  It has no basis for that claim, for all the reasons stated.

Moreover, EIF cannot establish that Columbia's continued use of the mark would cause "consumer

confusion," which EIF also would be required to establish.

On this point, the hearing evidence was unequivocal that the public has always associated

the *Encyclopaedia* with Columbia University, not with an entity that was created in 1990 to raise

money for the project.  Indeed, the evidence established that "Columbia University" has appeared

on the front cover of every one of the 106 fascicles that have been published since 1982.  (*See, e.g.*

Ex. S at 1).  EIF's contention that consumers would be confused if Columbia continues to publish

the *Encyclopaedia* has no support in the record, and the facts to which EIF points provide no such

support.

First, EIF cites the testimony of its Board Chair, Mr. Rouhani.  (EIF Br. at 26).   But that

citation is misleading and does not in any way support EIF's claim.  Specifically, when asked

about the fact that Brill had published the last two fascicles – *i.e.*, fascicles 4 and 5 of Volume 16

– Mr. Rouhani testified only that this "creates confusion, people are asking us what's going on."

(Tr. 63:19-20).  But Mr. Rouhani then explained that the "people" who were supposedly confused

were "contributors" and "donors."  (Tr. 63:20-64:21).  He clearly was not testifying about the

libraries, academics, students and other ***consumers*** of the *Encyclopaedia*.  EIF's characterization

of this testimony as offering evidence of "consumer" confusion is therefore false.

EIF also misleads this Court when it claims that Columbia "twice admitted" that its

publication of the *Encyclopaedia* through Brill causes consumer confusion.  (EIF Br. at 12, 26).

On this point, EIF is relying on a single public statement (not two) that Columbia released with

regard to this lawsuit.  (Ex. 2.19).  In that statement, Columbia stated that "***EIF's actions***" (not its

own actions) "have delayed and interfered with Columbia's scheduled editing and publishing of

*Iranica*, and have caused confusion among contributors and other scholars in the field." (Ex. 2.19). As the context makes perfectly clear, that statement referenced the fact that EIF had taken over administrative control over the [www.iranicaonline.com](www.iranicaonline.com) website and that the publication currently appearing on that website "is not authorized by Columbia." (Ex. 2.19) The second reference to "confusion" is in that same public statement and similarly ascribed the confusion to "***EIF's actions***," not Columbia's. (Ex. 2.19). Accordingly, EIF's claim that Columbia "twice admitted" to having caused confusion by publishing fascicles 4 and 5 is demonstrably false.

Unable to support their claim of "consumer confusion" with actual evidence, EIF seeks to relieve itself of the factual burden by claiming that "counterfeit" products are "inherently" confusing. (EIF Br. at 25). But unlike every case cited by EIF on this point, Columbia is not producing a "counterfeit" version of a product that EIF is also producing, such that the consuming public could be confused about what it is getting. While Columbia stands ready to publish fascicle 6 of Volume 16, that fascicle will not compete in commerce with any fascicle separately published by EIF for the obvious reason that EIF is and always has been a fundraiser; it does not (and could not) create content and is not responsible for the quality of that content. Thus, unlike cases in which goods "are identical and directly competitive" (EIF Br. at 26), the libraries and scholars who purchase fascicle 6 of Volume 16 of the *Encyclopaedia* will not in any way be confused about the origin or quality of what they are buying. While fascicle 6 will be distributed by Brill instead of Eisenbrauns, so was fascicle 4 (which led to no confusion) and so was fascicle 5 (which led to no confusion). (Tr. 279:4-10, 16-18). EIF was required to prove that somehow consumers will be uniquely confused by fascicle 6 when they were not confused by fascicles 4 or 5; and EIF did not show anything of the kind.

The consumers, of course, do not associate the quality of the content of the *Encyclopaedia* with the vendor that distributes it, which has changed several times over the years. Rather, the consumers of the *Encyclopaedia* have always associated and will continue to associate the quality of the *Encyclopaedia* with the world-renowned research University that has produced it, and whose name has appeared on its front cover, for the last 40 years. *See Liebowitz v. Elsevier Science Ltd.*, 927 F. Supp. 688, 696 (S.D.N.Y. 1996) (consumers of journals "expect, in large part, scholarly articles in the fields covered by the journals, selected and edited in accordance with the standards to which they have become accustomed"). As Dr. Daniel explained in reference to fascicle 5 of Volume 16, which Brill published in July 2019, there has been no confusion in the marketplace as a result of that publication: "[S]o far as I can tell from what we've heard, the correspondence we've had, everybody proceeds with the same assumption as they have for 40 years, that this is a publication of the Center for Iranian Studies at Columbia University." (Tr. 279:4-10). Accordingly, lifting the TRO and allowing Columbia to publish the fascicle 6 – which will be the 107th fascicle in the series – will confuse no one at all.

### F.  The Timeliness of Columbia's Copyright Claims is Irrelevant

EIF also argues that it is likely to succeed on its ***trademark*** claims because it has registered ***copyrights*** "for the five most recent volumes" of the *Encyclopaedia* and because Columbia's copyright claims in this case are supposedly time-barred. (EIF Br. 27-28). EIF's detour into copyright on a motion about trademark is irrelevant.

First, copyright issues are irrelevant to this motion because there is no claim in this case that EIF owns or registered copyrights in the articles that comprise fascicle 6, or the ones to follow, which are the publications that EIF seeks to enjoin. Although Columbia believes that it owns all copyrights with respect to prior volumes of the *Encyclopaedia*, that issue is not before the Court on this motion, which is based exclusively on trademark and directed exclusively at future

publications.   Second, copyright issues are irrelevant to EIF's motion because EIF has not brought any copyright claims in this case.   Although Columbia's action seeks a declaration that Columbia owns the copyrights in the work, EIF's countersuit does not assert a copyright claim against Columbia.   ECF No. 1 (EIF Complaint).   EIF's motion for an injunction is neither the time nor the place for EIF to litigate the merits of its potential defenses to Columbia's lawsuit.   Indeed, to date EIF has not even filed an Answer to Columbia's complaint, so it has neither formally disputed Columbia's copyright allegations nor raised the statute of limitations as a defense to those claims.   Thus, EIF's argument with respect to copyright is an improper attempt to have this Court decide the merits of a claim that EIF has never asserted.

Finally, copyright issues are irrelevant to this motion because trademark and copyright present separate and distinct legal issues.   *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 207 (S.D.N.Y. 2015) ("The Movants' conflation of the distinct disciplines of copyright and trademark law, however, is fatally flawed."); *see generally EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 63 (2d Cir. 2000) (explaining that "[t]rademark law is concerned with protection of the symbols, elements or devices used to identify a product in the marketplace and to prevent confusion as to its source.   It does not protect the content of a creative work of artistic expression as a trademark for itself," while "[c]opyright law protects the artist's right in an abstract design or other creative work," and noting that "[t]he different purposes of trademark and copyright law bear on the different rights each law creates."); 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 6:14, at 6-28 (4th ed. 1996) ("Thus, the scope of rights in copyrights and trademarks is defined quite differently.").   Accordingly, EIF's desperate effort to support its baseless trademark claims with arguments about its non-existent copyright claim should be rejected.

## II.    <u>EIF Has Not Demonstrated Irreparable Harm</u>

Although demonstrating "irreparable harm" is "the single most important prerequisite for the issuance of a preliminary injunction," *Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir.1999) (citation omitted), EIF failed at the hearing to offer any actual evidence of irreparable harm.

First, EIF relies on Mr. Rouhani's testimony, referenced above, that an unspecified number of unidentified "people" have raised "questions" to him about this dispute between EIF and Columbia. (EIF Br. at 29 (citing SOF 41, in turn citing Tr. 63:14-64:5)). But vague and unsupported testimony about mere "questions" hardly demonstrates harm, let alone irreparable harm. Second, EIF claims that an unspecified number of unidentified "donors" have become "hesitant" about donating to EIF. (EIF Br. at 29). But EIF does not actually show that any of these anonymous donors who allegedly "hesitated" actually failed to contribute. Irreparable harm is "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (citation omitted). The mere ***possibility*** of an ***unspecified*** decline in ***monetary*** contributions fails every element of that test. In fact, since EIF's fundraising goal had been to amass $15 million for a potential endowment (Ex. C at 25), any hesitation to donate to EIF, which has more than $18 million in the bank (Tr. 68:2-7), is more likely explained by the fact that its fundraising goal has already been met, as well as the fact that it has refused to use the donations previously made to support the project and endow the Center, as Professor Yarshater had requested. (Declaration of Margaret Edsall, dated July 28, 2020, ECF No. 82 at ¶ 5; Ex. U at 1). Third, EIF claims that it is "likely" to cease operations as a non-profit public charity if donations continue to decline. (EIF Br. at 13). But again, that argument rests

exclusively on the conclusory statement by EIF's Treasurer, who failed to cite **any** factual support for that claim.  And in any event, the evidence shows that EIF's contribution levels have been low for years, including before the dispute with Columbia arose.  (*See* Ex. K at 18 (reflecting that the last significant monetary gift EIF received—approximately $530,000 in public support—occurred in 2012); Ex. N at 16 (showing that there was no year through 2018 in which EIF raised more than $80,000)).    Accordingly, EIF cannot establish the "single most important prerequisite" for issuance of an injunction.

### III.    EIF Has Not Demonstrated a Balance of Hardships in Its Favor

Nor does the balance of hardships favor EIF.  On this point, EIF simply repeats the non-specific and speculative harms identified above, and claims that those harms outweigh the harm to Columbia from enjoining publication of the *Encyclopaedia*.  (EIF Br. at 29).  EIF also relies on its claim that Columbia has "admitted" to confusing the market (EIF Br. at 29), which has already been shown above to be flatly false.

EIF further argues that Columbia would remain free, even if enjoined, to continue publishing "articles on Iranian culture and history" under a different name.  (EIF Br. at 30).  But that argument is grossly misleading and disingenuous, as the project has never been about the mere publication of random articles.  Rather, the *Encyclopaedia Iranica* is on *on-going*, scholarly reference work, which has been published since 1982 in the format of an encyclopedia, with topics organized alphabetically.  (Ex. W at 2-4).  To date, 106 fascicles have been published in that format, with the first fascicle in 1982 covering topics from AB to ABD-AL-HAMID and the most recent fascicle (fascicle 5 of Volume 16, published in October 2019) addressing topics under the letter K (KHAVARAN-NAMA — KHOMEINI).  (Ex. S at 1, 311).  Although each fascicle includes individual articles, those articles are selected for publication and presented for their

placement in this larger reference work, enhancing their relevance and significance.  (Ex. W at 3-5).  As the hearing evidence established, scholars contribute to the *Encyclopaedia* because of the stature and reputation of this reference work, which has been developed over four decades.  (Tr. 274:5-20).  Accordingly, an injunction against publication would fundamentally disrupt and forever alter the nature of this scholarly reference work, essentially ending the *Encyclopaedia **as an encyclopedia.***  The mere "hesitancy" of donors to contribute to EIF, even if true, hardly compares to the very real harm already being caused to this immensely important scholarly project.

### IV.    EIF Has Not Demonstrated that an Injunction Is In The Public Interest

Finally, EIF contends that restraining publication of this important and high-quality scholarly reference work somehow would serve the public interest because the public, "and in particular the academic community,"  has an interest in "being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  (EIF Br. at 30) (quoting *New York City Triathlon v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344) (S.D.N.Y. 2010)).  That argument turns reality on its head.  The hearing evidence established conclusively that the public, and the academic community in particular, has ***always*** associated the *Encyclopaedia Iranica* with Columbia University, the research institution that has been home to the Center since its founding, the institution whose scholars and editors have ensured the publication's quality, and the institution whose name appears on the front cover of every fascicle since 1982.  (Tr. 279:6-10; Ex. T at 1-2; Tr. 262:19-263:22; Ex. S).  In contrast, EIF has cited no evidence – none – that anyone, whether in the academic community or otherwise, associates the origin or quality of the *Encyclopaedia* with EIF.  The *Encyclopaedia* has been a project of Columbia University for forty years; EIF, in contrast, has merely raised some of the money for the

project, and only since 1990.  (Ex. C at 8).  EIF has also publicly disclaimed any role in the content

of the publication (Ex. C at 9), and therefore its alleged "reputation" – of which the record is devoid

of evidence – could not be associated with the quality of the work.   The public interest thus

strongly favors the publication of the *Encyclopaedia Iranica*, and the academic community in

particular will be significantly harmed if EIF is allowed to restrain publication of this revered,

scholarly work.

## CONCLUSION

The Court should deny EIF's Motion for a Preliminary Injunction.


Dated:    September 17, 2020
          New York, New York

Respectfully submitted,

BUCKLEY LLP


/s/ Andrew W. Schilling
Andrew W. Schilling
Daniel R. Alonso
Brian J. Wegrzyn
Megan E. Whitehill
Alyssa M. Helfer
1133 Avenue of the Americas, Suite 3100
New York, New York 10036
Tel:  (212) 600-2330
aschilling@buckleyfirm.com

Amanda R. Lawrence
Benjamin B. Klubes (*pro hac vice*)
2001 M Street NW, Suite 500
Washington, DC 20036
Tel: (202) 349-8000

*Attorneys for The Trustees of*
*Columbia University in the City of New*
*York and Elton Daniel*